**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LANCE JETT,
        *Plaintiff-Appellant,*

v.

M. PENNER, D. PETERSON, and
CHERYL K. PLILER, Warden,
        *Defendants-Appellees.*

No. 04-15882

D.C. No.
CV-02-02036-GEB
(JFM)

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, Jr., District Judge, Presiding

Argued and Submitted
January 12, 2006—San Francisco, California

Filed March 9, 2006

Before: A. Wallace Tashima and William A. Fletcher,
Circuit Judges, and Edward F. Shea,* District Judge.

Opinion by Judge Shea

---

*The Honorable Edward F. Shea, United States District Judge for the
Eastern District of Washington, sitting by designation.

**COUNSEL**

Frank J. Riebl and Kelly A. Woodruff, Farella, Braun, and Martel, LLP, San Francisco, California, for the appellant.

Catherine Woodbridge, Deputy Attorney General, Sacramento, California, for the appellees.

**OPINION**

E. SHEA, District Judge:

Plaintiff Lance Jett, who fractured his right thumb while housed in California State Prison-Sacramento ("CSP-Sacramento"), brought this action against prison doctors, M. Penner and Douglas Peterson, and Warden Cheryl Pliler, alleging Defendants (1) violated his constitutional rights by being deliberately indifferent to his serious medical needs in violation of the Eighth Amendment and (2) violated California Government Code § 845.6 by failing to ensure he timely saw an orthopedist to set and cast his fracture as directed by the initial physician's aftercare instructions. Mr. Jett appeals the district court order adopting the magistrate judge's Findings and Recommendation to grant Defendants' summary judgment motion.

We have jurisdiction over this timely appeal and hold the district court erred in adopting the magistrate's Findings and Recommendations because (1) Mr. Jett provided sufficient

evidence, including medical slips, a letter, and a grievance, to demonstrate the existence of a genuine issue of material fact as to whether Dr. Penner's failure to see Mr. Jett prior to December 24, 2001, was deliberate indifference; (2) Mr. Jett provided sufficient evidence to demonstrate the existence of a triable issue of fact as to whether Dr. Penner's post-December 24, 2001, conduct was deliberately indifferent to Mr. Jett's need to have his fractured thumb set and placed in a permanent cast; (3) Mr. Jett presented sufficient evidence to establish the existence of a genuine issue of material fact as to whether Dr. Peterson and Warden Pliler were deliberately indifferent to Mr. Jett's condition because Mr. Jett is entitled to an inference that these individuals received the letters Mr. Jett wrote and sent via institutional mail advising of his fractured thumb and need to see an orthopedist; and (4) Mr. Jett stated a cause of action under California Government Code § 845.6 because this statute requires medical care to be summoned for an inmate who needs immediate medical care to have a fractured bone set and cast. Because we reverse the district court's summary judgment ruling and conclude Mr. Jett presented sufficient evidence to go to trial on these causes of action, we need not address Mr. Jett's contention the magistrate's discovery and scheduling orders effectively denied him the opportunity to take depositions.

## I.  BACKGROUND

On October 27, 2001, Mr. Jett fell from the top bunk to the floor of his prison cell at CSP-Sacramento and injured his right thumb. Because the injury occurred on a Saturday and there were no doctors on staff at the prison, Mr. Jett was taken to Mercy Hospital emergency room in Folsom, California, where he was seen by Dr. Kendrick Johnson. Dr. Johnson diagnosed Mr. Jett with a fracture to the first metacarpal of the right thumb. Dr. Johnson prescribed pain medicine, placed Mr. Jett's thumb in a temporary SPICA splint, and advised Mr. Jett verbally and in written aftercare instructions not to use his right hand and to ". . . see [an] orthopedic doctor early

this week for recheck appointment." When Mr. Jett returned to CSP-Sacramento, the written aftercare instructions were given to a medical technical assistant.

Three days later, on October 30, 2001, Mr. Jett was seen at the prison by Charles I. Hooper, D.O. Dr. Hooper continued Mr. Jett on pain medication. Mr. Jett's hand was still too swollen to place in a permanent cast.

Throughout November and most of December 2001, Mr. Jett was not seen by a physician. He was in pain and relayed his need to be seen by an orthopedist to set and cast his fractured thumb by notifying a medical technical assistant, submitting medical slips, sending a letter to Dr. Penner on December 8, 2001, filing a formal grievance on December 11, 2001, and sending a letter to Dr. Peterson on December 13, 2001.

On December 24, 2001, — almost two months after the injury and diagnosis of the fractured thumb — Mr. Jett was seen by Dr. Penner. Dr. Penner requested an x-ray and noted that Mr. Jett's hand was still in the SPICA splint. The x-ray occurred on December 27, 2001, and the radiology report prepared by Dr. Andrew Nicks states, "fracture of the base of the first metacarpal is again identified. The fracture is oblique which extends into the margin of the articular surface. The position of the fragments appears to be unchanged. Healing is underway. . . . The fracture is healing. Deformity and slight angulation is stable." Dr. Penner reviewed the x-ray on January 30, 2002, noting, "healing fracture."

Following the December 24, 2001, consult with Dr. Penner, Mr. Jett continued to submit medical slips asking to be sent to an orthopedist to have his fractured thumb set and cast. On January 2, 2002, Dr. Penner removed Mr. Jett's splint, commenting in his notes, "I reviewed xrays which showed no ~~obvious~~ fracture malalignment." (Alteration in original.) On January 18, 2002, Dr. Penner again saw Mr. Jett and ordered

another x-ray to "[rule out] nonunion of fractures." Dr. Penner prescribed additional pain medication.

Following a February 1, 2002, visit, Dr. Penner noted that he wanted an x-ray of the old fracture or to obtain a copy of a previous x-ray, as well as to obtain an orthopedist consult to follow up with the SPICA cast for the fracture. This orthopedic consultation request was marked "routine" and was not submitted by Dr. Penner until March 13, 2002.

The x-ray ordered by Dr. Penner on January 18, 2002, was taken on February 14, 2002. The radiology report for the x-ray states:

> [a]n old fracture deformity is seen at the base of the first metacarpal. Spurring is seen projecting from the base of the metacarpal. The fracture is well-healed. The articular surface is irregular. Mild, probably post traumatic, degenerative change is present at the metacarpophalangeal joint. No dislocation or significant subluxation is seen. . . . Old fracture deformity involving the first metacarpal.

The radiology report for a March 22, 2002, x-ray contained similar findings and conclusions.

In February, Mr. Jett wrote a letter to Warden Pliler to tell her that, even though he had put in medical slips, he had not received a cast for his fractured hand. On February 19, 2002, a physical therapist advised Mr. Jett to begin hand physical therapy. Several days later, Mr. Jett was examined by Dr. Penner on February 25, 2002. Dr. Penner noted that the base of Mr. Jett's thumb was tender and Mr. Jett had "limited opposition now." *Id.* This was Mr. Jett's last visit with Dr. Penner until August 20, 2002.

Mr. Jett was seen by Dr. Hooper on March 15, 2002. Dr. Hooper ordered an x-ray, a consult with an orthopedic hand

specialist, and pain medicine. The requested x-ray occurred on March 22, 2002. Dr. Ronald Hetrick reviewed the x-ray and found:

> [t]here is a deformity of the proximal end of the metacarpal to the thumb which appears well-healed. There is an osteophyte present. This represents an old fracture with secondary osteoarthritis . . . There is no evidence for an acute fracture or dislocation, but there is also a deformity of the distal end of the second metacarpal consistent with a previous old healed fracture.

On April 9, 2002, a physician — not Dr. Penner — submitted an "urgent" Request for Services for outpatient "hand ortho surgeon." On April 29, 2002, Dr. Fong, an orthopedic specialist in Manteca, California, examined Mr. Jett's hand. Dr. Fong determined Mr. Jett should be referred to a hand specialist because the fracture had healed improperly.

Mr. Jett was next seen by Dr. Penner on August 20, 2002, with two subsequent visits on October 7, 2002, and November 12, 2002. On each of these occasions, Dr. Penner noted that a hand specialist consultation was pending.

On December 4, 2002, Mr. Jett was transferred to Pleasant Valley State Prison where he continued to take steps to obtain treatment for his hand. Ultimately, on May 30, 2003, — more than a year after Dr. Fong, the orthopedic specialist, recommended Mr. Jett be referred to a hand specialist and more than nineteen months since the injury to his hand — Mr. Jett was seen by Dr. Jeffrey L. Tanji at U.C. Davis Medical Center. Based on the current record, it is unclear what treatment Dr. Tanji provided; however, Dr. Tanji's letter to a doctor at Pleasant Valley State Prison following the May 30, 2003, appointment reflects Dr. Tanji planned to discuss pin placement with Mr. Jett to help repair the "quite . . . bad fracture."

Mr. Jett initiated this action *pro se* on September 17, 2002, seeking damages for pain and suffering and the continuing diminished use of his hand. He alleged causes of action under the Eighth Amendment and California Government Code § 845.6. Without holding a scheduling conference or obtaining information from the parties, the magistrate issued scheduling and discovery orders. Defendants filed a dispositive motion, and on January 16, 2004, the magistrate issued "Findings and Recommendations," recommending the district court grant summary judgment to Defendants on all of Mr. Jett's causes of action. The district court adopted the magistrate judge's recommendations in full and granted summary judgment in Defendants' favor on March 30, 2004. Mr. Jett timely appealed, and the Ninth Circuit appointed counsel for Mr. Jett.

We review *de novo* the district court's summary judgment ruling. *See Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002); *Devereaux v. Abbey*, 263 F.3d 1070 1074 (9th Cir. 2001) (en banc).

## II. ANALYSIS

### *42 U.S.C. § 1983: Eighth Amendment*

[1] Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In the Ninth Circuit, the test for deliberate indifference consists of two parts. *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " *Id.* at 1059 (citing *Estelle*, 429 U.S. at 104). Second, the plaintiff must show the defendant's response to the need was deliber-

ately indifferent. *Id.* at 1060. This second prong — defendant's response to the need was deliberately indifferent — is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Id.* Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* at 1059 (quoting *Hutchinson v. United States*, 838 F.3d 390, 392 (9th Cir. 1988)). Yet, an "inadvertent [or negligent] failure to provide adequate medical care" alone does not state a claim under § 1983. *Id.* (citing *Estelle*, 429 U.S. at 105). A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs. *Id.* at 1060. If the harm is an "isolated exception" to the defendant's "overall treatment of the prisoner [it] ordinarily militates against a finding of deliberate indifference." *Id.* (citations omitted).

Mr. Jett argues the district court erred by adopting the magistrate's Findings and Recommendations because he presented sufficient evidence to establish Defendants were deliberately indifferent to his need to have his fractured thumb set and cast.[1] We agree with Mr. Jett; therefore we reverse and remand for trial.

A.   Dr. Penner

The magistrate's Findings and Recommendations concluded Mr. Jett failed to present sufficient evidence to establish a genuine issue of material fact as to whether Dr. Penner was deliberately indifferent to Mr. Jett's fractured thumb. The magistrate concluded there was no evidence showing Dr. Penner was aware of Mr. Jett's request to see an orthopedic surgeon until the examination on December 24, 2001, and the evidence showed Dr. Penner's care on December 24, 2001,

---

[1] It is undisputed Mr. Jett's fractured thumb was a serious medical need.

and onward was not deliberately indifferent to Mr. Jett's fractured thumb because Dr. Penner ordered x-rays, prescribed pain medicine, continued to see Mr. Jett, and ultimately ordered an orthopedic consultation. We disagree with these conclusions because the submitted evidence viewed in its entirety in a light most favorable to Mr. Jett is sufficient to demonstrate triable issues of fact as to (1) when Dr. Penner knew of Mr. Jett's injury and (2) whether Dr. Penner's care was deliberately indifferent to Mr. Jett's medical need to have his fractured thumb set and cast. *See Hutchinson*, 838 F.2d at 393.

**[2]** First, as to whether Dr. Penner knew of Mr. Jett's fractured thumb and his need to see an orthopedic doctor prior to December 24, 2001, there is evidence the aftercare instructions were in Mr. Jett's medical file, he sent medical slips, he filed a medical grievance on December 11, 2001, and he sent a letter via institutional mail to Dr. Penner on December 8, 2001, describing his need to see an orthopedic doctor to set and cast his fractured right thumb. Dr. Penner denied being aware of Mr. Jett's fractured thumb until December 24, 2001; however, viewing the facts in Mr. Jett's favor, it must be presumed that Dr. Penner received the December 8, 2001, letter in a timely fashion. *See Moore v. Jackson*, 123 F.3d 1082, 1087 (8th Cir. 1997) ("Whether the defendant actually received plaintiff's letter requesting dental care in August 1994, [sic] is a question of fact . . . ."). As the party opposing the motion for summary judgment, Mr. Jett is entitled to an inference that Dr. Penner was aware of the filed grievance, medical slips, and aftercare instructions in his medical record. Accordingly, the trier of fact could find, prior to December 24, 2001, Dr. Penner was aware of Mr. Jett's need for aftercare for his fractured thumb and that Dr. Penner's failure to see Mr. Jett to ensure the fracture was set and cast was deliberate indifference to a serious medical condition.

**[3]** Second, we find the evidence, when viewed in Mr. Jett's favor, demonstrates the existence of a genuine issue of

material fact as to whether Dr. Penner's post-December 24, 2001, conduct constituted deliberate indifference to Mr. Jett's serious medical condition. At his deposition, Mr. Jett stated that Dr. Penner advised him at the initial visit on December 24, 2001, "don't worry about it, we got it all tooken [sic] care of, we know that you have to go back out [to Mercy Hospital emergency for a follow-up]." Yet, Mr. Jett was never taken to Mercy and did not see an orthopedist until April 2002, approximately six months after the injury. In response to an interrogatory, Dr. Penner stated that Mr. Jett was not returned to Mercy Hospital for a follow-up visit because CSP-Sacramento generally sends patients to Manteca, its contracted facility. This response neither explains nor excuses the fact that Mr. Jett was not taken to an orthopedist at a *contracted* facility prior to April 2002. In addition, "the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns." *McGucken*, 974 F.2d at 1060 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). Accordingly, if Dr. Penner decided not to request an orthopedic consultation merely because Mr. Jett could not go back to Mercy, a non-contracted facility, this is "akin to cases finding deliberate indifference where prison officials and doctors deliberately ignore[ ] the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner." *Hamilton v. Endell*, 981 F.2d 1062, 1066-67 (9th Cir. 1992) (citations omitted), *abrogated in part on other grounds by Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1045 (9th Cir. 2002); *Hartsfield v. Colburn*, 371 F.3d 454 (8th Cir. 2004). Mr. Jett presented sufficient information for this question to go to the finder of fact.

**[4]** Other evidence viewed in Mr. Jett's favor indicating deliberate indifference to Mr. Jett's need to have his fractured thumb set and cast consists of Mr. Jett's continued submission of medical slips to obtain such care and Dr. Penner's decision to submit a "routine" request for an orthopedic consult approximately two-and-a-half months after his initial visit with Mr. Jett and approximately one month after Dr. Penner's

form was filled out. The fact finder could infer deliberate indifference from Dr. Penner's act of striking out the word "obvious," resulting in a statement of "no malalignment" in his notes, after reviewing a radiology report which specifically indicates a deformity.[2] *See, e.g., Hathway v. Couglin*, 37 F.3d 63, 68 (2d Cir. 1994) (finding "[a] jury could infer deliberate indifference from the fact that [the doctor] knew the extent of [the inmate's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [the inmate's] situation"). In our view, this is not a case involving differing medical opinions regarding treatment methods, *see Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), because Dr. Penner recognized, as did all other physicians who saw Mr. Jett, Mr. Jett needed to see an orthopedist, as evidenced by Dr. Penner's March 2002 request for an orthopedic consult for Mr. Jett.

**[5]** Finally, the record is replete with evidence showing the delay was harmful. Dr. Penner's own notes indicate the harm caused by the delay. Dr. Penner's December 24, 2001, notes state that Mr. Jett's thumb is still "healing;" whereas, his March 2002 notes state that Mr. Jett's thumb is "healed." Dr. Nicks' radiology summary for the December 27, 2001, x-ray states, "healing is underway," and the summary for the February 14, 2002, x-ray states the "fracture is well-healed." The radiology summaries clearly indicate, because the fracture did not align upon healing, the thumb was deformed; this deformity was inferentially caused by the delay in referring him to an orthopedist who could have properly set and cast his fractured thumb.

**[6]** Thus, we conclude Mr. Jett presented sufficient evidence to have the finder of fact decide when Dr. Penner knew of Mr. Jett's fractured thumb and his need to have it set and

---

[2]In pertinent part, Dr. Penner's January 2, 2002, notes state, "I reviewed xrays which showed no ~~obvious~~ fracture malalignment." (alteration in original).

cast and whether the care provided by Dr. Penner constituted deliberate indifference to Mr. Jett's serious medical need.

## B.   Dr. Peterson and Warden Pliler

**[7]** We conclude the magistrate incorrectly determined Mr. Jett did not present sufficient evidence to establish the existence of a genuine issue of material fact as to whether Dr. Peterson and Warden Pliler were deliberately indifferent to Mr. Jett's need to have his thumb set and cast. As prison administrators, Dr. Peterson and Cheryl Pliler are liable for deliberate indifference when they knowingly fail to respond to an inmate's requests for help. *See Estelle*, 429 U.S. at 104; *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005). In answers to interrogatories, both individuals advised that they were not aware of Mr. Jett's condition until the lawsuit. However, Mr. Jett is entitled to an inference at the summary judgment stage that Dr. Peterson and Warden Pliler received the letters he swore he sent to them. *See Moore*, 123 F.3d at 1087 (finding a triable issue of fact existed as to whether the administrator of the correctional facility received the letter sent by the inmate, which the administrator denied receiving).

### *California Government Code § 845.6*

**[8]** California Government Code § 845.6 provides, in relevant part:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, . . . a public employee . . . is liable if the employee knows or has reason to know that the prisoner is in *need of immediate medical care* and he fails to take reasonable action to summon such medical care.

(emphasis added). In order to state a claim under § 845.6, a prisoner must establish three elements: (1) the public

employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care. *Id*. "Liability under section 845.6 is limited to serious and obvious medical conditions requiring immediate care." *Watson v. California*, 26 Cal. Rptr. 2d 262, 265 (Ct. App. 1993). This section does not impose a duty to monitor the quality of care provided. *Id.* at 843.

**[9]** The magistrate determined Mr. Jett's § 845.6 cause of action was centered on the adequacy of the treatment provided. We disagree. While Mr. Jett was taken to a hospital where his condition was diagnosed, a triable issue of fact exists as to whether Mr. Jett received immediate medical care for his diagnosed fractured thumb because the fracture was not set and placed in a cast. The meaning of a Californian statute is not determined from a single word or sentence but is construed in context and given a reasonable construction while the words of the statute are given their plain meaning. *Diamond Multimedia Sys., Inc. v. Super. Ct.*, 968 P.2d 539, 546 (Cal. 1999). We hold the term "immediate medical care" as used in the statute includes both diagnosis and treatment and therefore conclude the need for "immediate medical care" can arise more than once in relation to an ongoing serious medical condition. Without such an interpretation, § 845.6 would create the cruel illusion that a prisoner would receive both diagnosis and treatment for a serious medical condition. In our view, the California Legislature did not intend such an illusion when it enacted § 845.6, and we will not allow it to be the result. Additionally, if the California Legislature intended the duty of summoning immediate medical care to be limited only to diagnosis or to the first time there was need for treatment for a serious medical condition, it would have specified such. No such limitation on the stated statutory duty to summon immediate medical care is included within § 845.6.

**[10]** Here, Mr. Jett was diagnosed and instructions were given for treatment: "[m]ust see orthopedic doctor this week

for recheck appointment." The need for immediate medical care — treatment — arose as soon as his swelling subsided and his fracture could be reduced and a cast applied. Accordingly, Defendants violated § 845.6 if they had knowledge of Mr. Jett's need for immediate medical care to set and cast his fracture and did not summon such care. Mr. Jett provided sufficient evidence to support a finding that Defendants knew of his need to have medical care summoned to set and cast his fracture and they took no steps to summon orthopedic care as Dr. Johnson's aftercare instructions directed. The fact finder should determine whether a violation of § 845.6 occurred.[3]

## III.   CONCLUSION

Because the deadline for filing dispositive motions had expired by the time the district court entered its summary judgment ruling and because we conclude Mr. Jett presented sufficient evidence to demonstrate the existence of triable issues of fact in connection with both his deliberate indifference cause of action and his California Government Code § 845.6 cause of action, we do not address whether the magistrate's discovery and scheduling orders effectively prevented Mr. Jett from gathering evidence to oppose Defendants' dispositive motion. Accordingly, the district court's summary judgment ruling is reversed, and the case is remanded for further proceedings consistent with this opinion.

**REVERSED** and **REMANDED**.

---

[3]The issue of the adequacy of the care that Mr. Jett received is immaterial to the issue of whether § 845.6 was violated by the delay between the diagnosis of the fracture and the treatment for the fracture.