**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CION ADONIS PERALTA,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>T.C. DILLARD, Chief Dental Officer;<br>S. BROOKS, D.D.S. Staff Dentist;<br>J. FITTER, Chief Medical Officer,<br>*Defendants-Appellees*. | No. 09-55907<br><br>D.C. No.<br>2:05-cv-01937-<br>JVS-PLA<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted
October 10, 2012—Pasadena, California

Filed January 7, 2013

Before: Ferdinand F. Fernandez and Marsha S. Berzon,
Circuit Judges, and Marco A. Hernandez,[*] District Judge.

Opinion by Judge Fernandez;
Dissent by Judge Berzon

---

[*] The Honorable Marco A. Hernandez, United States District Judge for
the District of Oregon, sitting by designation.

**SUMMARY**[**]

**Prisoner Civil Rights**

The panel affirmed the district court's judgment following a jury verdict in favor of a prison dentist in a prisoner's 42 U.S.C. § 1983 action alleging deliberate indifference to medical needs related to his dental care.

The panel held that the district court did not err when it instructed the jury on the question of whether defendant could be held responsible for failing to provide services when he lacked resources. The panel held that the instruction was proper because it took account of the duties, discretion and means available and properly advised the jury that if the prison dentist could not render or cause to be rendered the needed services because of a lack of resources that he could not cure, he also could not be individually liable.

Dissenting, Judge Berzon stated that the majority upheld a jury instruction absolving a prison dentist of liability for providing constitutionally deficient care, even though he was not entitled to be so exonerated under 42 U.S.C. § 1983 or the Eighth Amendment.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Derek Milosavljevic, Kirkland & Ellis LLP, Los Angeles, California, for Plaintiff-Appellant.

Janine K. Jeffery, Reily & Jeffery, Northridge, California, for Defendants-Appellees.

**OPINION**

FERNANDEZ, Circuit Judge:

Cion Adonis Peralta appeals the district court's judgment as a matter of law in favor of Dr. Thaddeus Dillard and Dr. Junaid Fitter and its judgment following a jury verdict in favor of Dr. Sheldon Brooks, in Peralta's 42 U.S.C. § 1983 action claiming that they were deliberately indifferent to his medical needs related to dental care. In this opinion, we decide whether the district court erred when it instructed the jury on the question of whether Dr. Brooks could be held responsible for failing to provide services when he lacked resources.[1] We affirm.

**BACKGROUND**

Peralta was incarcerated at various California state prisons, prior to January 24, 2004, when he arrived at California State Prison, Los Angeles County ("Lancaster"). He remained in Lancaster until February 7, 2006. While he was there, Dr. Brooks was a staff dentist.

---

[1] We address Peralta's claims against Dr. Dillard and Dr. Fitter in an unpublished memorandum disposition filed this date.

Within three days of his arrival at Lancaster, Peralta submitted oral and written requests for dental care. He asserted that he had cavities and bleeding gums and that he needed to receive treatment for pain. Having received no immediate response, Peralta filed a Form 602 Inmate Appeal on July 15, 2004. He stated that he had infected teeth, cavities, and severe pain, but he had not been seen by a dentist despite having submitted requests. The initial informal response by the medical appeals analyst, dated August 13, 2004, indicated that the appeal was partially granted; he was placed on a waiting list to see a dentist.

The wait for routine care could take up to twelve months, but emergency dental cases were given a higher priority. The length of the waiting list, as well as the limited amount of time that staff dentists could ultimately spend with patients, was due to staff shortages at Lancaster during 2004–05 and to other constraints on the dentists' time. Moreover, while Dr. Brooks and the other doctors tried to address the shortage through various means, including requests for more resources and changing staff schedules to allow staff to see more patients, they had no control over the staffing budget, which was set at the state level.

On August 23, 2004, Peralta formally appealed the decision by the medical appeals analyst and stated that waiting for a number of months was inadequate. In response and pursuant to the procedure for Form 602 appeals, Dr. Brooks interviewed Peralta on October 15, 2004. The dental progress notes indicate that Dr. Brooks had one x-ray taken, reviewed Peralta's Form 602 and his health history form, and performed a clinical examination of tooth #2. He found severe bone loss and mobility and assessed the tooth as a candidate for extraction; he also prescribed twelve ibuprofen

tablets and planned to extract tooth #2 on the next visit. He did not, however, examine Peralta further for other cavities or infections.

After that interview, Dr. Brooks prepared and signed a first-level appeal response. It stated that the appeal was partially granted. It also stated that Dr. Brooks had prescribed pain medication and that Peralta would be scheduled for an extraction. It noted that there was a waiting list for dental procedures. A second staff dentist, Dr. Kumar, also signed the Form 602 and the first level appeal response.

On October 21, 2004, Peralta sought a second level review of his Form 602 Appeal. He stated that he was not examined, but only asked which tooth hurt most and was given four days' worth of Motrin although he had existing dental needs or pain. On January 25, 2005, while the review was still pending, Peralta saw Dr. Brooks a second time in order to have tooth #2 extracted. During the appointment, Dr. Brooks explained that the tooth had no cavity and did not need to be extracted, but that he could have it extracted if it was causing him pain. Peralta decided not to have the tooth pulled at that time. Dr. Brooks did obtain x-rays, reviewed Peralta's health history form, and performed an examination, assessment and consultation. He also prescribed twelve ibuprofen tablets and, prophylactically, tetracycline for infection.

Peralta saw Dr. Brooks the third and last time on December 23, 2005. At that time, Dr. Brooks cleaned Peralta's teeth; Dr. Brooks testified that the time for cleaning teeth of a patient with the amount of plaque and calculus build up that Peralta had would take twenty to thirty minutes.

In February 2006, Peralta was transferred to Mule Creek State Prison.

This case proceeded to trial on May 5, 2009. After judgment as a matter of law was granted in favor of Dr. Dillard and Dr. Fitter, the case continued as to Dr. Brooks alone and was presented to the jury, which returned a special verdict in his favor. The jury determined that Dr. Brooks did not act with deliberate indifference to Peralta's severe dental needs and thereby cause him harm. The district court issued judgment in accordance with that special verdict on May 26, 2009. This appeal followed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review the issue of whether a jury instruction misstates the law de novo. *See Clem v. Lomeli*, 566 F.3d 1177, 1180–81 (9th Cir. 2009).

## DISCUSSION

Peralta's sole attack on the judgment in favor of Dr. Brooks is based upon Peralta's assertion that the district court erred when it gave the following instruction to the jury:

> Evidence has been presented during the trial regarding dental staffing levels and the availability of resources at the Lancaster correctional facility where Plaintiff Peralta

was incarcerated during the time of his alleged injuries in this case.

Whether a dentist or a doctor met his duties to Plaintiff Peralta under the Eighth Amendment must be considered in the context of the personnel, financial, and other resources available to him or her or which he or she could reasonably obtain. A doctor or dentist is not responsible for services which he or she could not render or cause to be rendered because the necessary personnel, financial, and other resources were not available to him or her or which he or she could not reasonably obtain.

Peralta does not complain about the precise wording of the instruction; rather, he asserts that our cases preclude consideration of available resources when an individual is sued for violating a prisoner's Eighth Amendment[2] rights due to deliberate indifference to that person's serious medical needs.[3] To sustain his deliberate indifference claim, Peralta had to meet the following test:

First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary

---

[2] U.S. Const. amend. VIII.

[3] Therefore, it is the principle we address here; we do not intend to induce the reader to see the instruction as an all purpose form or, for that matter, the very best possible wording for an instruction of this type.

> and wanton infliction of pain.  Second, the
> plaintiff must show the defendant's response
> to the need was deliberately indifferent.  This
> second prong — defendant's response to the
> need was deliberately indifferent — is
> satisfied by showing (a) a purposeful act or
> failure to respond to a prisoner's pain or
> possible medical need and (b) harm caused by
> the indifference.

*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citations and internal quotation marks omitted); *see also Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004).  Even when officials "actually knew of a substantial risk to inmate health or safety [they] may be found free from liability if they responded reasonably to the risk . . . ." *Farmer v. Brennan*, 511 U.S. 825, 844, 114 S. Ct. 1970, 1982–83, 128 L. Ed. 2d 811 (1994).  But what is (and should be) the law when those in charge of funding refuse to give the providers of prisoner care sufficient funds to allow them to afford the level of care that prisoners need?  For example, suppose, as here, the established standard is 1 dentist for every 950 inmates, but the dentist must work at a 1 dentist for every 4200–4500 inmates ratio.  Is the individual dentist to be held responsible because he cannot give proper care to the inmates, that is, he cannot reasonably respond to the risk of harm that those underserved inmates face when dental problems occur or are about to occur?  We think not.  As we noted over two decades ago in the context of a prisoner's stabbing, it is one thing to seek injunctive relief against state officials for the general conditions at a facility, and an entirely different thing when a prisoner seeks to mulct an individual prison employee with damages.  *See Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).  In the latter instance, we cannot simply react to

deplorable conditions at the prison, but must "take a very individualized approach which accounts for the duties, discretion, and means of each defendant." *Id.* at 633–34; *see also Clement v. Gomez*, 298 F.3d 898, 905 n.4 (9th Cir. 2002). That is as it should be. The point was put most eloquently by the Eleventh Circuit Court of Appeals thirty years ago. *See Williams v. Bennett*, 689 F.2d 1370 (11th Cir. 1982).

In *Williams*, a prison had been run in a manner that placed prisoners at a severe risk of violence. *Id.* at 1375. A prisoner brought an action against a number of prison officials, who had not given him reasonable protection; he accused them of deliberate indifference. *Id.* at 1374–75. However, the problems at the prison were said to be largely caused by a lack of funding. *Id.* at 1387. The trial court had instructed the jury in a manner similar to the instruction here. *Id.* The court of appeals recognized that lack of funds will not generally defeat claims for constitutional violations. *Id.* However, its response to the attack on the instruction was:

> In contrast [to considering injunctive relief], however, we are called upon to consider the liability of individual state employees for injuries suffered as a result of the unconstitutional conditions. Unlike the state, an individual defendant generally has neither the power to operate nor close down a prison. Moreover, we refuse to adopt the position that an employee who attempts to accommodate the constitutional rights of prisoners in his charge, within the financial limitations imposed, should, instead, resign from his position because of the realization

that full compliance is impossible in the absence of adequate funding. Indeed, the corrections official who walks away could be said to act with greater indifference than those who remain and attempt to work within the system.

In essence, the availability of funds, or lack thereof, is relevant in determining whether the individual is capable of committing the constitutional wrong alleged. Although each prison employee owes a duty to the inmates affected by his function, that duty must be measured by the scope of his discretion and the extent of his authority. For example, an individual defendant should be able to demonstrate that he had insufficient authority to correct the constitutional deficiencies in the prison. He also should be permitted to demonstrate that he did not have the resources necessary to correct that deficiency.

*Id.* at 1388 (citations omitted); *see also Lopez v. LeMaster*, 172 F.3d 756, 762 & n.4 (10th Cir. 1999); *Anderson v. City of Atlanta*, 778 F.2d 678, 680, 686–87 (11th Cir. 1985). Just so.

The above does not, of course, suggest that a governmental entity cannot be held liable in damages for its own wrongdoing when it incarcerates individuals, but refuses to provide the proper funds. That is not the issue before us. Nor do we suggest that injunctive or declaratory relief can be turned aside simply because necessary resources have not

been made available.  *See, e.g.*, *Jones v. Johnson*, 781 F.2d 769, 770, 772 (9th Cir. 1986) (dismissal of a complaint for damages and injunctive relief was overturned on the basis that a cause of action had been stated; however, the question of individual responsibility and of damages as such was not taken up); *Spain v. Procunier*, 600 F.2d 189, 200 (9th Cir. 1979) (holding injunctive relief proper despite assertions about the cost of proper facilities).  *Leer*, 844 F.2d at 633 (distinguishing between injunctive relief and damages); *Williams*, 689 F.2d at 1388 (same).

Thus, a proper standard must take account of the "duties, discretion and means" available.  *Leer*, 844 F.2d at 633.  The instruction in question here did just that.  It did not give a free pass to those who could, but did not bother to, give a constitutional level of care to an inmate.  Rather, it, in effect, stated that if the employee involved — here Dr. Brooks — could not "render or cause to be rendered" the needed services because of a lack of resources that he could not cure, he also could not be individually liable.

## CONCLUSION

We see no reason to impose an injustice upon employees of prison systems in an attempt to avoid injustices to inmates.  Nor do we see any reason to drive prison employees out of positions where they can at least try to ameliorate afflictions, even though they have no apotropaion that will effect cures in the absence of sufficient resources.  To do so would be to provide an iatrogenic remedy.  Thus, we hold that the principle contained in the instruction given in this case was a proper one.

**AFFIRMED.**

BERZON, Circuit Judge, dissenting:

The majority upholds a jury instruction absolving a prison dentist of liability for providing constitutionally deficient care, even though under our case law, he was not entitled to be so exonerated.[1]  Because the instruction in question does not properly state any applicable rule under 42 U.S.C. § 1983 or the Eighth Amendment — whether with respect to the requisite mens rea, causation requirement, any immunity doctrine, or otherwise — I respectfully dissent.

# I

A reasonable juror could conclude that the record in this case establishes the following facts regarding Dr. Sheldon Brooks's deliberate indifference to Cion Peralta's serious medical needs:[2]

Shortly after arriving at Lancaster prison in June 2004, Peralta made a formal request for dental care to address his bleeding gums and pain in his teeth.  After receiving no response for about a month, he filed a written appeal seeking dental attention to his "severe pain."  The prison responded by placing him on the "routine" dental care waiting list.

---

[1] I discuss Peralta's claims against Dr. Dillard and Dr. Fitter in a dissent from the memorandum disposition filed concurrently with this opinion.

[2] "Although this is an appeal from a jury verdict, because [I would] conclude the jury instruction[] w[as] erroneous, the prevailing party is not entitled to have disputed factual questions resolved in his favor because the jury's verdict may have resulted from a misapprehension of law rather than from factual determinations in favor of the prevailing party." *Clem v. Lomeli*, 566 F.3d 1177, 1179 (9th Cir. 2009) (internal quotation marks omitted).

Patients on that list could expect to wait about twelve months to receive care.

Dr. Brooks initially saw Peralta on October 15, 2004. At the appointment, Peralta complained of bleeding gums and pain throughout his mouth. Brooks responded to Peralta's complaints by explaining: "We're not going to worry about that today." Brooks did not examine Peralta for cavities, periodontal disease, or infection. Nor did Brooks prescribe a treatment plan for periodontal disease. Instead, Brooks asked Peralta which *one* tooth hurt the most. Brooks x-rayed the tooth that Peralta identified, scheduled Peralta to have that tooth extracted, and gave Peralta a few-day supply of ibuprofen. Although he did not examine Peralta for cavities or infection, or address the cause of Peralta's pain, Brooks signed a form noting that Peralta's appeal was "partially granted in that [Peralta] was examined by the dentist."

Peralta immediately sought review of his appeal, contending that the examination was incomplete and inadequate. Drs. Fitter and Cassim "partially granted" the appeal by leaving Peralta on the routine waiting list for further care. In December 2004, Peralta sought the next level of administrative review of his appeal, noting that it had been six months since he first complained of "severe pain" and bleeding gums.

In January 2005, at his next appointment, Brooks took another x-ray. Peralta decided against having the earlier-identified tooth extracted, after Brooks informed him that the tooth did not need extraction, and because the pain throughout the rest of his mouth remained unaddressed. Brooks gave Peralta antibiotics and twelve ibuprofen but did not otherwise address his bleeding gums or pain. Brooks did

not prescribe a course of treatment for periodontal disease or check Peralta for cavities.  The appointment lasted about five minutes.[3]

Peralta waited almost a year to see Brooks again.  At a December 2005 appointment, Brooks finally cleaned Peralta's teeth.  Brooks again did not check Peralta for cavities or prescribe an ongoing course of treatment for periodontal disease other than recommendations for improved oral hygiene.[4]

---

[3] The majority states that Dr. Brooks "reviewed Peralta's health history form, and performed an examination, assessment and consultation."  Maj. Op. at 5.  A reasonable juror could have credited Peralta's testimony that the January 2005 visit lasted only about five minutes and that once Peralta decided against the extraction, Brooks "didn't address the cavities or the pain, the bleeding, or anything."  Brooks agreed that the "focus" of the January 2005 visit was on the single tooth that Peralta had identified and testified that he did not check Peralta for cavities during that visit or "prescribe a course of treatment for periodontal disease."  Although Peralta's medical records for that visit contain the notation "clinical exam – #2 [tooth] – indicated, bone loss," the records do not refer to an "assessment" or "consultation" with regard to Peralta's other complaints.

[4] There was disputed testimony as to whether Peralta was diligent in caring for his teeth and gums.  Peralta's medical records noted his poor oral hygiene.  Peralta testified that he was at times unable to floss regularly because the Lancaster prison did not provide dental floss but that he brushed regularly and flossed when he could.  Peralta was allowed to order "care packages" including items such as floss, but during his time at Lancaster, the five care packages he ordered contained only food items such as candy and cookies, as well as non-sugary foods.  Peralta testified that except for one occasion, he did not eat the sugary foods but rather traded them for other items, such as playing cards, and on occasion, dental floss.

## II

Before directly addressing the jury instruction at issue, I first note what is *not* at issue in this appeal: There is no question that a reasonable jury could have found that Brooks was deliberately indifferent to Peralta's serious medical need in the sense described in *Farmer v. Brennan*, 511 U.S. 825 (1994). Indeed, the district court denied Brooks's Rule 50 motion, stating: "I can't say that a reasonable dentist would perform the duties in the same way that Dr. Brooks performed the duties." Nor does the majority assume otherwise.

To establish Brooks's liability for an Eighth Amendment claim based on inadequate prison medical treatment, Peralta needed to demonstrate three elements: (1) a "serious medical need," such that "failure to treat [the] condition could result in further significant injury or the unnecessary and wanton infliction of pain," *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks omitted); (2) that Brooks was "aware of" that serious medical need, *see Farmer*, 511 U.S. at 837; and (3) that Brooks disregarded the risk that need posed, *see id.* at 846, such as by denying or delaying care, *see Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir. 2012); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

A reasonable juror could have concluded that Peralta satisfied each of these elements. First, Peralta's chronic dental pain and bleeding gums were a serious medical need. *See Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). Second, Brooks was plainly aware of Peralta's complaints; Peralta explained his symptoms at each of his appointments and in the appeal form that Brooks reviewed. Third, Brooks

provided only scant attention to Peralta's complaint of serious pain, prescribing no ongoing course of treatment for periodontal disease and offering only to extract one tooth, which neither Brooks nor Peralta considered the cause of Peralta's primary symptoms and which Brooks determined was not diseased.

In short, Brooks knew that Peralta needed care for a serious medical need but did not provide the care. Under *Farmer*, that combination of factors is all that is required to establish deliberate indifference.

The case cited by the majority, *Leer v. Murphy*, 844 F.2d 628 (9th Cir. 1988), decided before *Farmer*, does not hold otherwise. *Leer* determined that when a prisoner seeks to impose Eighth Amendment liability on a prison official in his individual capacity, "[t]he prisoner must set forth specific facts as to each individual defendant's deliberate indifference." *Id.* at 634. That is just what Peralta has done. In *Leer*, the plaintiffs did not establish a "causal connection" between the officials' failure to implement security procedures, and the third-party, prisoner-on-prisoner violence that caused the plaintiffs' injuries. *Id.* at 631, 633–34.[5] In contrast, Peralta has demonstrated that the assigned dentist failed to provide care responsive to a serious medical need despite actual knowledge of that need. The deliberate indifference standard does not require more.

---

[5] The case that Brooks and the majority cite in support of the disputed jury instruction, *Williams v. Bennett*, 689 F.2d 1370 (11th Cir. 1982), was also decided before *Farmer*, and also involved a claim against officials for failure to dispatch guards to prevent prisoner-on-prisoner violence, rather than a claim against a medical provider assigned to treat a patient.

## III

At the outset, I observe that the rule enunciated by the majority would deny relief in cases of a medical practitioner's deliberate indifference to a prisoner's medical needs even as egregious as in *Snow*, 681 F.3d at 987.[6] With particular concern for the precedent that the majority's opinion sets for even the most serious deprivations of prisoner medical care, I proceed to discuss why the instruction contravenes both our case law and first principles.

## A

Brooks was entitled to a jury instruction that "correctly state[d] the law" and was "not . . . misleading." *See Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009). In addition to

---

[6] In *Snow*, a Nevada prisoner sentenced to death could "barely walk" because of severe degenerative hip disease and "need[ed] assistance just to get up off of his bunk." 681 F.3d at 982. Prison physicians initially treated his condition only with pain medication. A year after Snow initially sought treatment, an "independent medical consultant" — an orthopedic surgeon — examined Snow, was "surprised Snow was able to walk at all," and recommended "a bilateral total hip arthroplasty . . . to replace both hip joints." *Id.* at 983. A panel of prison physicians comprised of non-specialists nonetheless denied the surgeon's "emergency" recommendation for surgery. *Id.* In the meantime, Snow's creatinine levels became "very high" because of the pain medication, and one prison doctor admitted that Snow's condition was "urgent" and "potentially life threatening." *Id.* at 983–84. The prison panel denied surgery a second time, and although prison doctors recommended a change in Snow's pain relief drug regimen, the prison was unable to supply the recommended medicine. *Id.* at 984. Prison staff then prescribed regular doses of oxycodone, a powerful narcotic. *Id.* The prison panel denied surgery a third time, before finally approving the surgery three years after the orthopedic surgeon first deemed Snow's condition an "emergency." *Id.* at 983–84.

instructing the jury on the deliberate indifference standard, the district court gave the following instruction:

> Evidence has been presented during the trial regarding dental staffing levels and the availability of resources at the Lancaster correctional facility where Plaintiff Peralta was incarcerated during the time of his alleged injuries in this case.
>
> Whether a dentist or a doctor met his duties to Plaintiff Peralta under the Eighth Amendment must be considered in the context of the personnel, financial, and other resources available to him or her or which he or she could reasonably obtain. A doctor or dentist is not responsible for services which he or she could not render or cause to be rendered because the necessary personnel, financial, and other resources were not available to him or her or which he or she could not reasonably obtain.

This instruction does not accurately state our case law. Our cases have made crystal clear — including when plaintiffs have sought damages — that "[b]udgetary constraints . . . do not justify cruel and unusual punishment." *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986). We recently reiterated that holding, *see Snow*, 681 F.3d at 987, and until now, have not deviated from that clear principle.

The majority says of *Jones* only that "the question of individual responsibility and of damages as such was not taken up," Maj. Op. at 11, and does not mention *Snow* at all.

Binding precedent cannot be treated so cavalierly. *Jones* was a case against individual defendants for damages in circumstances parallel to those here, and that claim for relief, as well as the claim for injunctive relief, was allowed to proceed. *Jones*, 781 F.2d at 770, 772. And *Snow* dealt at length with the liability of individuals for damages for unconstitutional denial of medical care, relying on *Jones*'s "holding that budgetary constraints do not justify cruel and unusual punishment" in the course of doing so. *Snow*, 681 F.3d at 987 (citing *Jones*, 781 F.2d at 771).

Nor has the Supreme Court stated otherwise. More than twenty years ago, the Court declined to decide whether prison officials could interpose a "'cost' defense" and rely on the argument that "fiscal constraints beyond [the officials'] control prevent[ed] the elimination of inhumane conditions." *Wilson v. Seiter*, 501 U.S. 294, 301–02 (1991). The Court "note[d that] there [was not] any indication that other officials have sought to use such a defense." *Id.* I am aware of no case in which the Court has revisited the issue, and Brooks has cited none.

Under binding Ninth Circuit case law, then, in no way inconsistent with the Supreme Court's rulings, Brooks was not entitled to have the jury instructed on a cost defense. Brooks therefore relies on out-of-circuit cases, principally the inapposite *Williams* case, *see supra* n. 5. For the reasons explained below, those cases not only contradict our holdings but, even if considered *ab initio*, do not correctly state the applicable rule.

**B**

The majority seems to understand the instruction as stating a causation principle. *See* Maj. Op. at 7–11. But the jury was already instructed as to § 1983's causation requirement, and a defendant is not entitled to duplicative instructions. *See United States v. Lopez-Alvarez*, 970 F.2d 583, 597 (9th Cir. 1992).

What's more, the instruction at issue misstates the causation requirement. We look to the "common law of torts" for the "necessary causation factor" under § 1983. *Stevenson v. Koskey*, 877 F.2d 1435, 1438–1439 (9th Cir. 1989) (citing Restatement (Second) of Torts ("Restatement")); *see also Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 n.2, 1194 n.3 (2011) (consulting the Restatement to determine principles underlying federal tort law). Applying tort law principles, an actor's reckless conduct is a "legal cause of harm" if the conduct "is a substantial factor in bringing about the harm," and the actor is not otherwise relieved of liability. Restatement §§ 431, 501. If two independent "forces are actively operating," and each "is sufficient to bring about harm," then the first actor's recklessness "may be found to be a substantial factor in bringing about" the harm. *Id.* §§ 432, 501.

In stating that if Brooks "could not reasonably obtain" resources necessary to provide care, then he "[was] not responsible," the instruction departed from the generally applicable causation rule. It relieved Brooks of liability for deliberately indifferent care because the ratio of dentists to prisoners encouraged rationing the care available. But Brooks could have provided constitutionally acceptable care to those patients to whom he rendered care, at the cost of not

assisting others who remained on the waiting list. And "[a] person deprives another of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act *which he is legally required to do* that causes the deprivation of which [the plaintiff complains]." *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1439–40 (9th Cir. 1991) (en banc) (emphasis added) (internal quotation marks omitted), *abrogated on other grounds by Farmer*, 511 U.S. at 837.

A medical professional "is under no legal obligation to render professional services to everyone who applies to him or her," absent a "statute providing otherwise." *See* 61 Am. Jur. 2d Physicians, Surgeons, and Other Healers § 121 (2012). Similarly, under the common law rule, "a physician could with legal impunity refuse to aid a stranger in need of immediate medical care." *Colby v. Schwartz*, 78 Cal. App. 3d 885, 890 (1978). Nor do medical ethics ordinarily require a provider to care for a person absent a pre-existing doctor-patient relationship. *See Agnew v. Parks*, 172 Cal. App. 2d 756, 763–64 (1959) (discussing the Hippocratic Oath). Although professional ethics may require medical professionals to provide some pro bono services to the indigent, there is no ethical obligation to provide care to any particular individual. *See* Am. Med. Ass'n, Current Opinions of the Council on Ethical & Judicial Affairs, Code of Medical Ethics ("Code of Medical Ethics") § 9.065 (1994); *id.* § 10.05 (2008); Am. Coll. of Dentists, Ethics Handbook for Dentists 14 (2012).

But "[a] patient-physician relationship exists when a physician serves a patient's medical needs." Code of Medical Ethics § 10.015 (2001); *see* Am. Dental Ass'n, Principles of

Ethics and Code of Professional Conduct § 2.F (2012). So once a patient-provider relationship is established, the provider "is bound by law to exercise a high standard of skill and care, to continue the treatment until the relation . . . is legally terminated, and not to abandon the case." 61 Am. Jur. 2d Physicians, Surgeons, and Other Healers § 121 (2012). Analogously, under the common law rule, a "physician who stopped and gave aid" to a "stranger in need of immediate medical care" through his actions "created a doctor-patient relationship and thereby assumed a duty of reasonable care towards the patient." *Colby*, 78 Cal. App. 3d at 890.

Here, Brooks was assigned to treat Peralta and first examined him on October 15, 2004, thereby creating a provider-patient relationship. Peralta claims — and a reasonable juror could find, *see supra* Part II — that Brooks failed to provide constitutionally adequate care in the subsequent fourteen months, during which time Brooks saw Peralta for two additional appointments and signed off on a form effectively denying Peralta's request for more thorough or timely care.

In sum, under basic principles of tort law, even if prison budget constraints were an independent and sufficient cause of the extraordinary delays in providing Peralta with basic dental care, that fact alone would not exonerate Brooks, if his own acts or omissions were also sufficient to cause Peralta — Brooks's assigned patient — harm.[7]

---

[7] Because of the particular considerations applicable here, I leave aside the question whether an instruction of the sort the majority approves might be appropriate in other circumstances.

By stating the opposite rule, the instruction allowed Brooks to point to inadequacies in California's prison system to preclude the jury's consideration of his own actions. But deficiencies and delays in California's provision of health care to prisoners are long-standing and endemic, *see Plata v. Schwarzenegger*, No. C01-1351-THE, 2009 WL 799392 (N.D. Cal. Mar. 24, 2009), *aff'd in part*, 603 F.3d 1088 (9th Cir. 2010), and "[n]eedless suffering and death have been the well-documented result." *Brown v. Plata*, 131 S. Ct. 1910, 1923 (2011). The instruction that the majority upholds will now allow prison officials sued for damages to flaunt our longstanding holding in *Jones* that "[b]udgetary constraints . . . do not justify cruel and unusual punishment." *Jones*, 781 F.2d at 771.

## C

Nor does the instruction accurately state any immunity principle.[8] In fact, under several lines of cases, a defendant is not entitled to invoke some independent unconstitutional conduct or policy to free himself of his own constitutional obligations.

First, courts have widely held that a party's purported defense that he was "'just following orders'" does "'not occup[y] a respected position in our jurisprudence.'" *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (quoting *O'Rourke v. Hayes*, 378 F.3d 1202, 1210 n.5 (11th Cir. 2004)); *Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999) (en banc) (collecting cases). Instead, "officials have an obligation to follow the Constitution even in the midst of a contrary directive from a superior or in a

---

[8] Notably, Brooks has not sought qualified immunity in this case.

policy." *Kennedy*, 595 F.3d at 337 (internal quotation marks omitted). The principle is so longstanding that in an 1804 opinion by Chief Justice Marshall, the Supreme Court upheld a damages award against the commander of an American warship for unlawfully seizing a Danish vessel, even though the seizure was made pursuant to a superior's instructions. *See Little v. Barreme*, 6 U.S. (2 Cranch) 170, 178–79 (1804) (Marshall, C.J.); *Busche v. Burkee*, 649 F.2d 509, 517 (7th Cir. 1981) (discussing *Little*). Analogously, we have held that police officers are not protected by qualified immunity when they act in reliance on training materials that contradict clearly established constitutional safeguards. *See Cal. Att'ys for Criminal Justice v. Butts*, 195 F.3d 1039, 1049–50 (9th Cir. 1999).

Second, officials are not immunized from liability for constitutional violations if they act pursuant to an unconstitutional statute. Even before the Supreme Court breathed new life into § 1983 through its interpretation of that statute in *Monroe v. Pape*, 365 U.S. 167 (1961), federal courts interpreted § 1983 to provide a damages remedy for "state-approved constitutional deprivations." *See id.* at 198 (Harlan, J., concurring).

Finally, police are not shielded from liability for unconstitutional searches or seizures simply because a neutral magistrate has issued the warrant on which the police rely. *See Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012). Rather, if "'it is obvious that no reasonably competent officer would have concluded that a warrant should issue,'" liability will attach. *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In sum, under a host of doctrines, we do not permit state actors to escape liability under § 1983 simply by pointing to some freestanding or intervening constitutional violation, or to unconstitutional directives from superiors. The rule should be no different where a doctor invokes a material constraint on his ability to discharge his duties under the Constitution to an assigned patient.

As I can find no support in § 1983 case law, the law of torts, or immunity doctrines for the instruction that the majority sanctions, I would hold that the instruction was a misstatement of the applicable law.

## IV

"An error in instructing the jury in a civil case requires reversal unless the error is more probably than not harmless." *Clem*, 566 F.3d at 1182 (internal quotation marks omitted). "Because we presume prejudice where civil trial error is concerned, the burden shifts to the defendant to demonstrate that it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Id.* (internal quotation marks omitted). "When the trial court erroneously adds an extra element to the plaintiff's burden of proof, it is unlikely that the error would be harmless." *Id.* (internal quotation marks and alterations omitted).

It was more probable than not that the district court's instructional error prejudiced Peralta. The instruction allowed the jury to decide the case on the impermissible ground that the prison's medical budget was inadequate — as to which evidence and argument was presented — and without regard to whether Brooks discharged his Eighth Amendment duties to Peralta. *See Jones*, 781 F.2d at 771;

*Snow*, 681 F.3d at 986.   As Peralta presented sufficient evidence for a reasonable juror to find that Brooks was a moving force behind the denial of care for Peralta's serious medical needs, the error could not have been harmless.

V

Finally, I must respond to the majority's suggestion that the novel instruction it approves is necessary on policy grounds — in particular, to avoid discouraging prison employees from continuing in their positions because budget constraints impact their ability to avoid committing constitutional violations. *See* Maj. Op. at 11.

As an initial matter, such a policy consideration is an improper basis "for departing from [the] strict application of" established principles of causation and immunity that do not otherwise entitle Brooks to the instruction at issue. *See Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 562 (1st Cir. 1998) (Breyer, J.).

Moreover, as I have noted, under longstanding principles, absent a basis for qualified or absolute immunity, a governmental employee's unconstitutional actions are not excused because committed under the directive of a superior or compelled by an unconstitutional statute.  An employee directed by a supervisor to commit an unconstitutional act might well lose her job if she refuses to comply, but we have not regarded that as a reason to absolve her of liability if she obeys the directive.  The dilemma for state employees is no different under the present circumstances.  The policy choice underlying the established principles I have discussed is that individuals of free will are obligated not to treat their fellow citizens unconstitutionally, even if it costs them their jobs and

fewer government services are provided, at least in the short term.  If the services are then not provided, the fault will be laid, politically if not legally, where it belongs — with the appointed superiors, or even more appropriately, with the elected officials who have created a system in which more people are imprisoned than can be accorded constitutionally adequate medical care with available funds.  *See Plata*, 131 S. Ct. at 1947 (upholding a prisoner release order to remedy the California legislature's delay in ameliorating a prison system unable to provide constitutional care).  The alternative — that the only recourse for constitutional violations created by inadequate resources is institutional reform litigation, leaving those already injured to absorb their own losses — is not the model we have adopted, as I have explained, nor the one best designed to impel elected officials to operate constitutionally adequate prisons.

In any event, the majority's fear of an exodus of medical providers from prisons is unfounded.  It is a practical certainty that a prison employee sued in his individual capacity will not himself be on the hook for any damages. California indemnifies any public employee for a judgment arising from acts or omissions "within the scope of his or her employment as an employee of the public entity," Cal. Gov't Code §§ 825(a), 825.2(b), and may even indemnify employees for punitive damages under certain circumstances, *id. §* 825(b).  Indemnification is "near[ly] universal" among state and local entities, either as a matter of official policy or practice.  Margo Schlanger, *Inmate Litigation*, 116 Harv. L. Rev. 1555, 1676 n.391 (2003); *see Arar v. Ashcroft*, 585 F.3d 559, 636 (2d Cir. 2009) (en banc) (Calabresi, J., dissenting); Lawrence Rosenthal, *A Theory of Governmental Damages Liability: Torts, Constitutional Torts, and Takings*, 9 U. Pa. J. Const. L. 797, 812 & n.51, 819 (2007) (noting the

"ubiquity of public employee indemnification" and collecting statutes); John C. Jeffries, Jr., *In Praise of the Eleventh Amendment and Section 1983*, 84 Va. L. Rev. 47, 50 (1998) (describing "constitutional tort actions against government officers" as "functional substitutes for direct access to government treasuries"). And in many states —  including California — a damages award is paid not from the state's general appropriations fund, but from the prison agency budget. Joshua J. Fougere, *Paying for Prisoner Suits: How the Source of Damages Impacts State Correctional Agencies' Behavior*, 43 Colum. J.L. & Soc. Probs. 283, 301 & n.101 (2010). A damages judgment against a prison dentist can therefore be expected to provide incentives to the California Department of Corrections and Rehabilitation (CDCR) to reallocate its sources of funding to provide constitutionally sufficient medical care.

The consequence of the majority's absolution of Brooks from any liability, then, is that the CDCR — the institution best positioned to remedy any institutional failure that may have contributed to Brooks's liability — is relieved from paying a damages award. As then-Judge Breyer put the point:

> [O]ne might argue that, in the context of a seriously deficient prison system . . ., courts should be unusually reluctant to [protect from liability] officials who are actually working for constructive change, lest damage[s] suits and the decisions of judges and juries, less knowledgeable about actual conditions, inadvertently interfere with conscientious efforts to achieve reform. In our view, however, if anything, the opposite is the

case. . . . [I]ndemnification by the state has the
effect of transferring some of the human cost
of the system, borne in the form of death and
misery, to the public treasury, and thereby,
perhaps, making the public more aware of
those costs, and encouraging change.

*Cortes-Quinones*, 842 F.2d at 562.

Permitting prisoners to obtain redress in suits against
individual defendants also comports with traditional
principles underlying equitable relief, as well as the Prison
Litigation Reform Act, under which a prospective injunction
is only appropriate when it is narrowly drawn and is "the least
intrusive means necessary" to vindicate a constitutional
violation. *See* 18 U.S.C. § 3626; *Califano v. Yamasaki*,
442 U.S. 682, 702 (1979). When a jury awards damages
against a state employee or official, and the award is paid
from the state's fisc or the agency's budget, the legislative or
executive branches can use cost-benefit analyses to choose
whether to reallocate resources to limit future liability or
continue to bear the costs of their unconstitutional practices.
Damages actions are thus less intrusive into the operation of
prisons by elected and appointed officials than structural
injunctions, which require ongoing judicial oversight of
prison management.

## VI

Unlike the majority, I see no basis in our caselaw for
allowing Brooks to rely on the CDCR's budget constraints to
immunize himself from liability for his own failure to give
basic attention to Peralta's serious dental needs. The rule that
the majority sanctions not only erects yet another barrier for

prisoner plaintiffs to obtain redress for deprivations of fundamental rights, but also eliminates one incentive for California policymakers to address systemic inadequacies in providing prisoners with the most basic level of medical attention.  Because I would hold that the jury instruction at issue was not harmless error, I would remand for a new trial.