**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SHANE HORTON, by his Guardian Ad
Litem Yvonne Horton,
*Plaintiff-Appellee*,

v.

CITY OF SANTA MARIA; SANTA
MARIA POLICE DEPARTMENT;
ANDREW BRICE,
*Defendants-Appellants*.

No. 15-56339

D.C. No.
2:14-cv-06135-
SJO-PJW

OPINION

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted February 15, 2018
Pasadena, California

Filed February 1, 2019

Before: Marsha S. Berzon and Jay S. Bybee, Circuit
Judges, and Sharon L. Gleason,[*] District Judge.

Opinion by Judge Berzon;
Dissent by Judge Bybee

---

[*] The Honorable Sharon L. Gleason, United States District Judge for
the District of Alaska, sitting by designation.

# SUMMARY[**]

### Civil Rights

The panel reversed in part and affirmed in part the district court's order denying summary judgment to defendants in an action brought pursuant to 42 U.S.C. § 1983 and California law by a pretrial detainee who alleged that defendants violated his Fourteenth Amendment right to be safeguarded from injury and his state law right to medical care while in custody.

After being arrested, plaintiff was detained in a temporary holding cell and left unattended for around half an hour, during which time he attempted suicide, causing permanent and severe injury. With his mother acting as guardian ad litem, plaintiff filed suit alleging, in part, that defendants were deliberately indifferent to his safety because they failed to take appropriate action after plaintiff's mother had warned a police officer over the phone that plaintiff was suicidal.

The panel held that defendant Officer Brice was entitled to  qualified immunity as a matter of law because a reasonable officer would not have known that failing to attend to plaintiff immediately after the phone call would be unlawful under the law at the time of the incident. The panel therefore reversed the district court's denial of summary judgment in favor of Officer Brice on the § 1983 claim.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel next held that it lacked jurisdiction to review the district court's denial of summary judgment in favor of the municipal defendants on the § 1983 claim. The panel noted that when a municipal defendant's motion for summary judgment is "inextricably intertwined" with issues presented in the individual officers' qualified immunity appeal, this court may exercise pendent party appellate jurisdiction. The panel held that in this case appellate resolution of the officer's appeal did not "necessarily" resolve the pendent claim of municipal liability. The panel noted that its holding that Officer Brice was entitled to qualified immunity did not preclude the possibility that a constitutional violation may nonetheless have taken place, including as a result of the collective acts or omissions of Santa Maria Police Department officers. The panel remanded to permit the district court to consider the claims in light of this court's recent guidance in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc), and *Gordon v. County of Orange*, 888 F.3d 118, 1125–26 (9th Cir. 2018).

Finally, the panel affirmed the district court's denial of summary judgment to defendants on the state law claim brought pursuant to California Government Code § 845.6, concluding that there was a genuine issue of material fact as to liability under state law.

Dissenting in part, Judge Bybee joined the majority's holding that Office Brice was entitled to qualified immunity for plaintiff's deliberate-indifference claim under 42 U.S.C. § 1983 and that the panel lacked jurisdiction over the municipal liability claim. Judge Bybee would have reversed the district court's denial of summary judgment on the state law claim, because he believed that there was no basis under California law for subjecting Officer Brice to suit.

## COUNSEL

Timothy T. Coates (argued) and Jonathan H. Eisenman, Greines Martin Stein & Richland LLP, Los Angeles, California; Kristine L. Mollenkopf, Assistant City Attorney, Santa Maria, California; Bruce D. Praet, Ferguson Praet & Sherman, Santa Ana, California; for Defendants-Appellants.

Martin N. Buchanan (argued), Law Offices of Martin N. Buchanan, San Diego, California; Rafael Gonzalez and Jared M. Katz, Mack Staton Mullen & Henzel LLP, Santa Barbara, California; Joseph Robert Finnerty and Robert W. Finnerty, Girardi Keese, Los Angeles, California; for Plaintiff-Appellee.

## OPINION

BERZON, Circuit Judge:

This case concerns the attempted suicide of a jailed pretrial detainee. Shane Horton was arrested for slashing an acquaintance's car tire and taken to the local police department, where he was detained in a temporary holding cell. Left unattended for around half an hour while the officer in charge spoke to his mother and completed paperwork, Horton removed his belt, fed it through the cell door bars, and hanged himself, causing permanent and severe brain damage.

With his mother acting as guardian ad litem, Horton brought suit under 42 U.S.C. § 1983 and California law. He contends that the City of Santa Maria, the Santa Maria Police Department, and several individual officers violated his Fourteenth Amendment right to be safeguarded from injury

and his state law right to medical care while in custody. We reverse the district court's denial of qualified immunity on the § 1983 claims as to Officer Andrew Brice, conclude that we lack jurisdiction to review the denial of summary judgment on the § 1983 claims as to the municipal defendants, and affirm the district court's denial of summary judgment on the state law claims.

## I. Factual and Procedural History

In the months leading up to his arrest, eighteen-year-old Horton had given his mother reason to be concerned. He used drugs, including marijuana, "Molly" (a pure form of 3,4-Methylenedioxymethamphetamine), and phencyclidine (PCP), and contemplated suicide. On December 13, 2012, he took PCP and "started freaking out." He extinguished cigarettes on his own face and hands, punched his fist through a window, tried to cut his wrist with a piece of broken glass, held a kitchen knife pointed at his throat, and, his mother understood, threatened to kill himself. That night, he was admitted to the emergency room, where he was initially held as a suicide risk. But he specifically denied to hospital staff any suicidal ideation, and the doctors came to suspect "that [his problem] was mostly drugs." Horton was discharged the morning of December 14, 2012, after an emergency room physician and a member of the county's Crisis and Recovery Emergency Services ("CARES") team agreed that he was not suicidal.

Approximately two weeks later, on the morning of December 29, 2012, Horton and his girlfriend became involved in a physical altercation. As his girlfriend was driving away with a friend, Horton pulled out a folding knife and slashed the tire of the friend's car.

Officers Andrew Brice and Duane Schneider soon arrived on the scene and found Horton. Horton admitted to slashing the tire, pointed the police to the knife, and remained calm and cooperative as the officers arrested him for misdemeanor vandalism.

Officer Brice stayed to interview Horton's girlfriend. She disclosed that Horton had hit her several times in the past, chased her with a knife, and stabbed a friend in the leg. She also revealed that he had made comments about killing police and sympathizing with the suspects in recent mass homicides.

While Officer Brice was speaking to Horton's girlfriend, Officer Schneider transported Horton to the police station, where he patted Horton down, confiscated his wallet and iPod, and placed him in a temporary holding cell. Officer Schneider did not remove Horton's jewelry or belt. As Officer Schneider prepared to leave, Horton said he was feeling anxious and "would really like to speak to someone" — "not a therapist. Even you." As they talked, Horton explained to Officer Schneider that it had been "a really, really, really rough three weeks straight." He described his recent drug use and the window-breaking incident, and said that he "had the shit beat out of me fucking thousands of times." At one point, Officer Schneider asked if he had any medical problems; Horton responded, "No, sir. Not that I know of. I'm real healthy as I'm aware. I'm just — besides feeling anxious right now and I hate being locked in a box . . . . I don't like being in a cell."

Eventually, Officer Schneider left, stating that he would "[p]robably do a psych or something."[1] He instructed Horton to wave at the security camera if he needed anything. A few minutes later, another police officer asked Horton if he had any medical problems; Horton again said he did not.

Approximately an hour and a half later, Officer Brice returned to the police station. Officer Brice spoke to Horton privately in an interview room, explaining that Horton's girlfriend and her friend both said that Horton slapped the girlfriend, and reporting that she had a mark on her consistent with that allegation. Officer Brice said that Horton's girlfriend had been granted a restraining order against him for one week, that he would be charged with felony domestic violence, and that he had the option to post bail. At one point during the conversation, Officer Brice asked Horton if he had any medical conditions, and Horton once again replied, "No, sir."

At the end of the interview, Officer Brice brought Horton back to the holding cell and gave him the opportunity to call his mother, Yvonne Horton.[2] Horton told his mother, "I'm in jail right now. I'm going to get booked and go to [the main county jail in] Goleta. You can choose to be there, get me out on bail or not. . . . I would appreciate it [if you came to get me out on bail], but it is up to you." Yvonne apparently said she would not bail him out, and he ended the conversation by saying, "It's okay, Mom. I'm sorry . . . . All right. I love

---

[1] Officer Schneider presumably meant that he was considering ordering a psychiatric evaluation of Horton.

[2] We use "Yvonne" in this opinion to distinguish the mother from her son.

you."    Before hanging up, Yvonne requested to speak privately to Officer Brice.

Officer Brice left Horton in the cell and, out of Horton's earshot, called Yvonne back.    Officer Brice spoke with Yvonne for ten to fifteen minutes, during which time, she stated in her deposition, she relayed "everything" about the December 13, 2012 incident — Horton's use of drugs, the cigarette marks on his face and hands, the knife he held to his throat, his hospitalization with an initial "5150" hold for risk of suicide,[3] the CARES official's conclusion that he could be discharged because his conduct was due to drugs not suicidal ideation, and her disagreement with that conclusion.    Yvonne testified that she also told Officer Brice that her son was depressed and suicidal, that she was really worried about him, and that she believed he could be helped in the judicial system.    And she recounted that she instructed Officer Brice to "please, watch him, please look after him, please."[4]

---

[3] California Welfare and Institutions Code § 5150 authorizes qualified officers or clinicians to involuntarily take into custody a person who, "as a result of a mental health disorder, is a danger to others, or to himself or herself, or gravely disabled." Cal. Welf. & Inst. Code § 5150.

[4] Officer Brice denies that Yvonne ever used the terms "suicidal" or "tried to kill himself."  He testified that Yvonne instead told him that CARES declined to keep Horton "because they believed his actions were drug induced," which she was upset about, and that she was equivocating on whether to bail him out, because she felt her son would be safer in jail than out.  However, in deciding this qualified immunity interlocutory appeal, we rely on the record as most favorable to Horton, *see Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and so disregard Officer Brice's testimony to the extent it contradicts that of Yvonne.

Officer Brice explained to Yvonne that he was getting ready to transport Horton to jail, which Yvonne understood to mean that they would be transporting him "very shortly." In response to Yvonne's pleas to look after her son, Officer Brice reassured her that "[h]e's safe here." When asked at deposition whether she ever told the police officer he had to go check on Horton immediately, she said, "I didn't think that I would have to do that. . . . I was under the impression, after I spoke to [him] in that way, that he would go back and check on him."

Instead of going immediately back to the cell, Officer Brice first went to complete the paperwork necessary to transport Horton to jail and prepare the transport van. When Officer Brice went to get Horton, approximately 27 minutes after leaving him,[5] Officer Brice discovered Horton hanging from the cell door, not moving. Officer Brice immediately called for assistance, administered CPR, and waited for the paramedics to arrive to transport him to the hospital. Horton survived the suicide attempt but suffered prolonged anoxia,[6] resulting in severe and permanent brain damage.

---

[5] As previously noted, Officer Brice's conversation with Horton's mother lasted for approximately ten to fifteen minutes. In the first few minutes of that conversation, Horton removed the belt he was wearing, strung it through the cell door bars, looped it around his neck, and slumped down. Approximately eight minutes before the phone call ended, Horton was no longer seen moving in the security camera video. Another twelve to seventeen minutes elapsed after the call ended before Officer Brice returned to Horton's cell and found him hanging.

[6] Anoxia refers to a restriction in oxygen flow to the brain. The longer the period of oxygen deprivation, the more severe the brain damage and "the lower the chances of a full or meaningful recovery." *Daniels v. Woodford*, 428 F.3d 1181, 1194 n.18 (9th Cir. 2005).

With his mother acting as guardian ad litem, Horton filed suit in October 2014 against the City of Santa Maria, the Santa Maria Police Department, Officer Brice, Officer Schneider, and other officers, claiming (1) negligence and (2) § 1983 liability on the part of the individual officer defendants, (3) liability on the part of the municipal defendants, *see Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978), and (4) liability under California Government Code § 845.6 on the part of all defendants.

The district court granted summary judgment to all defendants on the state law negligence claim and to all officers except Officer Brice on the § 1983 claims. As to Officer Brice, the district court held that there is a genuine issue of fact regarding whether Officer Brice acted with deliberate indifference to Horton's safety after speaking with his mother, and denied him qualified immunity. The court also denied summary judgment to the municipal defendants on Horton's § 1983 claim that those defendants failed to develop and adhere to a written policy regarding suicide detection and prevention; failed to develop and adhere to written policies regarding the identification and evaluation of mentally disordered detainees; and failed adequately to train their officers on such policies. Finally, the district court denied summary judgment to Officer Brice and the municipal defendants on the claim under California Government Code § 845.6, but granted summary judgment on that claim to the other individual officers. Officer Brice and the municipal defendants timely appealed. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

## II. Discussion

### A. Section 1983 Claim Against Officer Brice

The district court concluded that there is a genuine issue of fact regarding whether Officer Brice acted with deliberate indifference to Horton's safety after speaking with his mother, and denied the officer qualified immunity. Qualified immunity protects government officials from liability for civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Plaintiffs bringing § 1983 claims against individual officers therefore must demonstrate that (1) a federal right has been violated and (2) the right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We may "exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Id.* at 236. Here, we begin with the second, "clearly established" prong, for reasons that will appear.

### 1. Clearly Established Law

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). At the time of the events in this case, the generally applicable standard established that officers who act with deliberate indifference to the serious medical need of a pretrial detainee violated the detainee's constitutional rights under the Due Process Clause of the Fourteenth Amendment. *See, e.g.*, *Conn v. City of*

*Reno*, 591 F.3d 1081, 1090–91 (9th Cir. 2010), *vacated*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011).

Under Ninth Circuit law at the time of the incident, Fourteenth Amendment claims that officers acted with deliberate indifference to the medical needs of a pretrial detainee were governed by the same "deliberate indifference" standard as Eighth Amendment claims for failure to prevent harm to convicted prisoners. *See Simmons v. Navajo County*, 609 F.3d 1011, 1017 (9th Cir. 2010), *overruled in part by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc); *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1241–43 (9th Cir. 2010), *overruled by Castro*, 833 F.3d 1060. That standard provided that an officer was liable for deliberate indifference only if he "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety" — that is, if he was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and actually drew the inference. *Simmons*, 609 F.3d at 1017 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Deliberate indifference thus require[d] an objective risk of harm and a subjective awareness of that harm." *Conn*, 591 F.3d at 1095. (As we shall explain, that partially subjective standard has since been revised to an entirely objective standard for pretrial detainees. *See Gordon v. County of Orange*, 888 F.3d 1118, 1125–26 (9th Cir. 2018); *Castro*, 833 F.3d at 1068–71; *infra* pp. 16–18).

Two principles inform our clearly established law inquiry in this case. First, the qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201; *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("We have

repeatedly told courts . . . not to define clearly established law at a high level of generality."). It is therefore critical whether our case law had, at the time of the events in this case, sufficiently clarified when a detainee's imminent risk of suicide was substantial enough to require immediate attention.

Second, in *Estate of Ford v. Ramirez-Palmer*, we recognized that deliberate indifference claims "depend in part on a subjective test that does not fit easily with the qualified immunity inquiry," which is an objective inquiry. 301 F.3d 1043, 1049 (9th Cir. 2002). *Estate of Ford* concluded that even where the clearly established legal standard requires deliberate indifference, the qualified immunity inquiry should concentrate on the objective aspects of the constitutional standard. That is because "a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high." *Id.* at 1050. We held that "[i]n these circumstances, [an officer] would be entitled to qualified immunity" under the deliberate indifference standard. *Id.*

Thus, Horton must show that, given the available case law at the time of his attempted suicide, a reasonable officer, knowing what Officer Brice knew, would have understood that failing to check on Horton immediately after the phone call with Yvonne presented such a substantial risk of harm to Horton that the failure to act was unconstitutional. We turn to the directly applicable case law now, which is sparse.

At the time of Horton's incident, we had held that officers who failed to provide medical assistance to a detainee should

have known that their conduct was unconstitutional in two instances, neither of which resemble the facts in this case. *See Clouthier*, 591 F.3d at 1244–45; *Conn*, 591 F.3d at 1098.

*Clouthier* held that a mental health specialist who failed to take adequate precautions to protect a detainee from committing suicide was not entitled to qualified immunity. 591 F.3d at 1245.  The specialist knew that the detainee was suicidal, that he had attempted suicide multiple times, and that another staff member had placed the detainee in a suicide smock and warned that he needed to be "constantly monitored throughout the day to ensure his safety."  *Id.* at 1244.  Nevertheless, the specialist removed the detainee from regular suicide monitoring and instructed officers to return his regular clothes and bedding, which he eventually used to commit suicide.  *Id.* at 1245.  Under these facts, we concluded that "a reasonable mental health professional could not have thought it was lawful to remove key suicide prevention measures put in place by a prior Mental Health staff member."  *Id.*[7]

In *Conn*, we denied qualified immunity at the summary judgment stage to officers who, while transporting a detainee, observed her wrap a seatbelt around her neck in an apparent attempt to choke herself and who threatened to commit suicide. 591 F.3d at 1098.  The transporting officers did not take the detainee to a medical center or alert subsequent

---

[7] *Clouthier* also held that a prison deputy's knowledge of the detainee's past suicide attempts and present suicidal tendency was "insufficient to allow a jury to conclude that [the deputy] knew Clouthier was suicidal and deliberately ignored that risk." 591 F.3d at 1247. Because that holding was on the subjective knowledge prong of the deliberate indifference standard, it is not directly relevant to *Estate of Ford*'s objective reasonable official inquiry.

officers to the behavior; she then committed suicide. *Id.* We concluded that "[w]hen a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety." *Id*. at 1102.[8]

The facts of *Clouthier* and *Conn* do not at all resemble this case. Officer Brice's interactions with Horton began with his initial arrest, during which Horton remained cooperative. Officer Brice also spoke with Horton's girlfriend, who informed him of Horton's previous violent episodes, but did not indicate any present suicidal intentions. At the jail, Officer Brice asked Horton if he was having any medical problems, to which Horton responded in the negative.

Officer Brice did know that Horton, according to his mother, had been suicidal two weeks before the incident and that his mother thought he remained a suicide risk.

Based on these facts, which are taken in the light most favorable to Horton, a reasonable officer would not have known that failing to attend to Horton immediately would be unlawful under the law at the time of the incident. Horton did not attempt suicide in the presence of Officer Brice, as the detainee did in *Conn*. 591 F.3d at 1102. Nor, as was the case in *Clouthier*, had he attempted suicide multiple times and been deemed such a risk that medical specialists placed

---

[8] While *Conn* did not cite expressly to *Estate of Ford*, it did cite to *Clouthier* and did apply an objective test. *See Conn*, 591 F.3d at 1102 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (quoting *Saucier*, 533 U.S. at 202)).

significant suicide prevention measures in place, measures removed by the defendant. 591 F.3d at 1245. In short, whether or not Officer Brice was in fact deliberately indifferent to a substantial risk that Horton would attempt suicide in the time before he was checked, there was no case law at the time of the incident clearly establishing that a reasonable officer should have perceived the substantial risk.[9]

In short, applying *Estate of Ford*, the case law at the time of Horton's attempted suicide was simply too sparse, and involved circumstances too distinct from those in this case, to establish that a reasonable officer would perceive a substantial risk that Horton would imminently attempt suicide. We therefore reverse the district court's denial of summary judgment on qualified immunity as to Officer Brice.

## 2. The Current Deliberate Indifference Standard

Since the incident in this case took place, this court has announced a new liability standard governing Fourteenth Amendment failure-to-protect claims by pretrial detainees. *Castro v. County of Los Angeles* held that, in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), Fourteenth Amendment failure-to-protect

---

[9] Nor was there law at the time in other courts clearly establishing that a reasonable officer would have known that failing to immediately check up on Horton would have been unlawful. "In the absence of binding precedent, we look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) (citation and internal quotation marks omitted). We have not found other cases applying the objective qualified immunity inquiry prescribed by *Estate of Ford* to facts similar to Horton's case.

claims must be analyzed under a *purely* objective standard. *Castro*, 833 F.3d at 1068–71.  Under *Castro*, we ask whether there was "a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing the injury that the plaintiff suffered." *Id.* at 1070. There is no separate inquiry into an officer's subjective state of mind.

We have recently recognized that *Castro*'s objective deliberate indifference standard extends to Fourteenth Amendment claims by pretrial detainees for violations of the right to adequate medical care.  *See Gordon*, 888 F.3d at 1125–26.  This objective standard would therefore guide our analysis of whether a constitutional violation occurred here, were we to reach that question.  But it has no direct bearing on the question of whether Officer Brice would have known that a failure to immediately check on Horton violated a *clearly established* right *at the time of the incident.*

As the pre-*Castro* standard is no longer applicable, no purpose would be served for future cases from delineating the application of that standard to the constitutional merits of this case.    The two-step qualified immunity procedure "is intended to further the development of constitutional precedent," and we may decide "whether that procedure is worthwhile in particular cases." *Pearson*, 555 U.S. at 237, 242.  We therefore tend to address both prongs of qualified immunity where the "'two-step procedure promotes the development of constitutional precedent' in an area where this court's guidance is . . . needed." *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc) (quoting *Pearson*, 555 U.S. at 236); *see also Thompson v. Rahr*, 885 F.3d 582, 590 (9th Cir. 2018) (determining that a constitutional violation occurred before holding that the officer was entitled

to qualified immunity so that "[g]oing forward, . . . the law is clearly established in this scenario"). Here, *Castro* and *Gordon* have established the law going forward, and further delineation of the pre-*Castro* standard would serve little purpose, as it is no longer applicable. We therefore confine our inquiry to the second qualified immunity prong — whether the constitutional right at issue was "clearly established" at the time of the alleged violation.

## B. Section 1983 Claim Against Municipal Defendants

As to the denial of summary judgment in favor of the municipal defendants on Horton's § 1983 claims, we lack jurisdiction over the municipal defendants' appeal of that order.

*Monell* established that municipalities can be liable for infringement of constitutional rights, under certain circumstances. 436 U.S. at 690–95. In particular, municipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker. A municipality may not, however, be sued under a *respondeat superior* theory. *Id.* at 693–95. A plaintiff must therefore show "*deliberate* action attributable to the municipality [that] directly caused a deprivation of federal rights." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997). "Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Id.*

Although the requisites for municipal liability under § 1983 can be stringent, municipalities sued under § 1983,

unlike individuals, are not entitled to immunity, qualified or otherwise, and so, unlike individuals, can never be immune from trial.[10] The denial of summary judgment to a municipal defendant on a *Monell* claim is therefore no different from the denial of any ordinary motion for summary judgment, and so is not immediately appealable. *See Collins v. Jordan*, 110 F.3d 1363, 1366 n.1 (9th Cir. 1996); *Henderson v. Mohave County*, 54 F.3d 592, 594 (9th Cir. 1995).

There is, however, one caveat to this rule. When a municipal defendant's motion for summary judgment is "inextricably intertwined" with issues presented in the individual officers' qualified immunity appeal, this court may exercise pendent party appellate jurisdiction. *See Huskey v. City of San Jose*, 204 F.3d 893, 903–05 (9th Cir. 2000). In this context, the "inextricably intertwined" concept is a narrow one. "[A] pendent appellate claim can be regarded as inextricably intertwined with a properly reviewable claim on collateral appeal only if the pendent claim is coterminous

---

[10] The collateral order doctrine allows for appeals from a narrow category of interlocutory orders that do not fully resolve an action. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–47 (1949) (holding that certain interlocutory decisions could be final for purposes of 28 U.S.C. § 1291). Denials of qualified immunity are among that category. The qualified immunity defense shields government officials from the costs and distractions of litigation and not just from liability. *See Mitchell*, 472 U.S. at 526 (holding that the denial of qualified immunity is immediately appealable, as officials enjoy "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law"). Therefore, even though appellate review of a denial of qualified immunity would be possible after a final judgment, immediate appeal is permitted to protect the right of officials to be free from the burdens of litigation. Municipalities do not enjoy any parallel right to be shielded from such burdens.

with, or subsumed in, the claim before the court on interlocutory appeal — that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well." *Id.* at 905 (citation omitted). Here, appellate resolution of the collateral appeal does not "necessarily" resolve the pendent claim, for several reasons.

First, as we have explained, our qualified immunity determination with respect to Officer Brice rests solely on the "clearly established" law prong; we do not reach the question of whether Officer Brice's actions gave rise to a constitutional violation. "[A] municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred." *Gibson v. County of Washoe*, 290 F.3d 1175, 1186 n.7 (9th Cir. 2002), *overruled on other grounds by Castro*, 833 F.3d 1060. That is, the district court could still conclude that Officer Brice did commit a constitutional violation under the now-applicable standard and, if the other requisites of *Monell* liability are met, hold the municipality liable.

Second, although the district court granted summary judgment in favor of the individual defendants other than Officer Brice on the ground that there was insufficient evidence they committed a constitutional violation, the district court could reconsider those summary judgments in light of the new, purely objective standard for Fourteenth Amendment failure-to-protect claims, which we announced after the district court issued its order. *See Castro*, 833 F.3d at 1068–70. Further, the district court's grants of summary judgment as to the individual officers other than Officer Brice were not appealable, *see* 28 U.S.C. § 1291; *Way v. County of Ventura*, 348 F.3d 808, 810 (9th Cir. 2003), and therefore

cannot be assumed to be correct.  As a result, the district court could conclude that municipal constitutional violations occurred involving the actions of officers other than Officer Brice.

Third, municipal defendants may be liable under § 1983 even in situations in which no individual officer is held liable for violating a plaintiff's constitutional rights.  As we have previously acknowledged, constitutional deprivations may occur "not . . . as a result of actions of the individual officers, but as a result of the collective inaction" of the municipal defendant.  *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002).  "If a plaintiff establishes he suffered a constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983," regardless of whether their exoneration is "on the basis of qualified immunity, because they were merely negligent, or for other failure of proof."  *Id.* at 917 & n.4.[11]  Here, a reasonable jury

---

[11] Other circuits apply the same principle in *Monell* cases.  *See Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) ("[M]unicipal liability for constitutional injuries may be found to exist even in the absence of individual liability, at least so long as the injuries complained of are not solely attributable to the actions of named individual defendants."); *Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994) ("[A]n underlying constitutional tort can still exist even if no individual police officer violated the Constitution. . . . If it can be shown that the plaintiff suffered [an] injury, which amounts to deprivation of life or liberty, because the officer was following a city policy reflecting the city policymakers' deliberate indifference to constitutional rights, then the City is directly liable under section 1983 for causing a violation of the plaintiff's Fourteenth Amendment rights."); *Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) ("*Monell* . . . and its progeny do not require that a jury must first find an individual defendant liable before imposing liability on local government."); *Garcia v. Salt Lake County*, 768 F.2d 303, 310 (10th Cir. 1985) ("*Monell* does not require that a jury

might be able to conclude that Horton suffered a constitutional deprivation "as a result of the collective inaction" of the Santa Maria Police Department, *id.* at 917, or of officers' adherence to departmental customs or practices, *see, e.g.*, *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012); *Long v. County of Los Angeles*, 442 F.3d 1178, 1185–86 (9th Cir. 2006).

For example, taking the facts in the light most favorable to the plaintiff, a jury might find that the Santa Maria Police Department failed to ensure compliance with its written policy of removing belts from detainees. The department's policy manual indicated that arresting or booking officers "should" remove jackets, belts, and shoes. But, according to Officer Schneider, the "should" was understood to be optional and, before December 29, 2012, when the incident occurred, the usual practice was not to remove belts. An independent audit of the Santa Maria Police Department, conducted shortly before the incident for unrelated reasons, confirmed that "many SMPD members had only a passing knowledge of Department policies," and that custody practices were "loose."

Second, a reasonable jury might find that the Police Department failed to assure proper monitoring of its security cameras. Officer Schneider twice told Horton that, if he needed anything, he could simply wave at the security cameras and an officer would come over. But no officer apparently observed Horton looping his belt through the cell door and hanging from it for over twenty minutes before Officer Brice returned to his cell.

---

find an individual defendant liable before it can find a local governmental body liable.").

We do not decide whether any of these specific acts or omissions, or any other, if proven, would give rise to a municipal constitutional violation. Rather, our inquiry into the *Monell* claims at this stage is purely jurisdictional. For that purpose, we conclude that our holding that Officer Brice is entitled to qualified immunity does not preclude the possibility that a constitutional violation may nonetheless have taken place, including as a result of the collective acts or omissions of Santa Maria Police Department officers.

In sum, the pendent *Monell* claim is not inextricably intertwined with a properly reviewable collateral appeal, as our resolution of Officer Brice's appeal from the denial of summary judgment on qualified immunity does not "*necessarily*" resolve Horton's *Monell* claim. *Huskey*, 204 F.3d at 905. We therefore have no jurisdiction to review the denial of summary judgment as to the municipal defendants at this stage of the proceedings.

## C. State Law Claim Against All Defendants

Finally, Officer Brice and the municipal defendants contend they are entitled to immunity on Horton's state law claim. Under California law, prison officials generally cannot be sued for failing to provide medical care to a prisoner, unless the official knows, or reasonably should know, that the prisoner requires immediate medical care. California Government Code § 845.6 provides:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections

> 855.8 and 856, a public employee, and the
> public entity where the employee is acting
> within the scope of his employment, is liable
> if the employee knows or has reason to know
> that the prisoner is in need of immediate
> medical care and he fails to take reasonable
> action to summon such medical care.

Cal. Gov't Code § 845.6. Notably, under this statute, there is no analogue to the second prong of federal qualified immunity. Also, in contrast with *Monell* liability, California law allows for vicarious liability of a municipality whose employee violates the statute when acting within the scope of employment. *See* Cal. Gov't Code § 815.2.

The district court denied summary judgment to Officer Brice and the municipal defendants on Horton's § 845.6 claims, concluding that a reasonable jury could find that Officer Brice had reason to know Horton faced a substantial risk of attempting suicide and failed to take reasonable action to summon immediate medical care.

One threshold matter: We have jurisdiction over the denial of summary judgment as to the state law claims. For state law immunity claims denied before trial, "the availability of an appeal depends on whether, under *state* law, the immunity functions as an immunity from suit or only as a defense to liability." *Liberal v. Estrada*, 632 F.3d 1064, 1074 (9th Cir. 2011). "A denial of summary judgment is immediately appealable when the immunity is an immunity from suit . . ." *Id*. Section 845.6 confers immunity from suit, not only from liability, on public entities and public employees for injuries caused by the failure to provide

medical care. *Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051, 1070–71 (Ct. App. 2013).

Reviewing the denial of summary judgment on the state law immunity issue de novo, *see, e.g.*, *Hansen v. Dep't of Treasury*, 528 F.3d 597, 600 (9th Cir. 2007), and construing the facts in the light most favorable to Horton, the nonmoving party, *see Holmes v. Cal. Army Nat'l Guard*, 124 F.3d 1126, 1131–32 (9th Cir. 1997), we hold that there is a genuine issue of material fact as to liability on the state law claims.

"In order to state a claim under § 845.6, a prisoner must establish three elements: (1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care." *Jett v. Penner*, 439 F.3d 1091, 1099 (9th Cir. 2006).

Officer Brice and the municipal defendants offer several arguments for their immunity under § 845.6. First, they contend that Officer Brice's alleged failure promptly to summon medical care is tantamount to a failure to diagnose, for which defendants are immune from liability under California Government Code § 855.8(a). *See* Cal. Gov't Code § 845.6 (excepting from liability claims of injury resulting from diagnosing or failing to diagnose mental illness). We disagree. The scope of liability for the failure to summon medical care under § 845.6 is broader than the scope of immunity for the failure to diagnose, prescribe, or administer treatment under § 855.8.[12] *See Johnson v. County*

---

[12] California Government Code § 855.8 provides:

> (a) Neither a public entity nor a public employee acting within the scope of his employment is liable for injury

*of Los Angeles*, 143 Cal. App. 3d 298, 316–17 (Ct. App. 1983); *Nelson v. State*, 139 Cal. App. 3d 72, 80–81 (Ct. App. 1982).  The complaint alleges that the defendants subjected Horton to "a delay in and/or denial of medical or mental health care," not (or at least, not only) that they failed to diagnose or treat his mental illness — a responsibility typically entrusted to a medical professional.  *See Johnson*, 143 Cal. App. 3d at 316 ("We hold that as a matter of law a sheriff does not have the authority to make the final determination of diagnosing that a person is, or is not, afflicted with mental illness . . . . [S]uch determinations are properly made by physicians and other persons trained in the healing arts.").

Relatedly, the defendants argue that the exception to § 845.6's broad immunity rule concerns the failure to

resulting from diagnosing or failing to diagnose that a person is afflicted with mental illness or addiction or from failing to prescribe for mental illness or addiction.

(b) A public employee acting within the scope of his employment is not liable for administering with due care the treatment prescribed for mental illness or addiction.

(c) Nothing in this section exonerates a public employee who has undertaken to prescribe for mental illness or addiction from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing.

(d) Nothing in this section exonerates a public employee from liability for injury proximately caused by his negligent or wrongful act or omission in administering any treatment prescribed for mental illness or addiction.

*summon* medical care, and Horton's complaint centers on Officer Brice's *own* failure to return immediately to Horton's cell, rather than a failure to summon third-party medical care upon finding Horton. But Horton's complaint is not so limited: It specifically alleges that defendants had reason to know that "Horton was in need of immediate medical care" and "failed to take reasonable action to summon such medical care." Officer Schneider's statement that they should "[p]robably do a psych," indicates the kind of care that Officer Brice could have been expected to summon once he got off the phone with Yvonne.[13] Had Officer Brice requested a prompt psychiatric evaluation or otherwise summoned psychiatric care, Horton could have been found sooner and the period of anoxia he suffered shortened. We cannot say, as a matter of law, that Officer Brice's omissions did not proximately cause injury to Horton. *See Zeilman*, 168 Cal. App. 3d at 1187.

Finally, defendants maintain that Officer Brice did not know or have reason to know that Horton required immediate medical care. As to this proposition, two California Court of Appeal cases addressing § 845.6 claims premised on suicidal ideation are instructive. In *Lucas v. City of Long Beach*, 60 Cal. App. 3d 341 (Ct. App. 1976), the decedent hung himself in his cell after being arrested on charges of being drunk and disorderly. *Id.* at 344–45. Reversing a jury verdict in favor of the plaintiff, the Court of Appeal emphasized that

---

[13] There is little doubt that ordering a psychiatric evaluation could constitute "summoning medical care" under the California courts' broad view of "medical care." *See Zeilman v. County of Kern*, 168 Cal. App. 3d 1174, 1187 (Ct. App. 1985) (indicating that having medical personnel assist a pretrial detainee on crutches or providing a wheelchair would constitute "summoning medical aid").

there was "not a scintilla of evidence in the record indicating that [the decedent's] conduct was any different than one might expect of a person intoxicated on either drugs or alcohol." *Id.* at 350.

By contrast, in *Johnson v. County of Los Angeles*, the decedent had informed sheriffs "that he was attempting to commit suicide and that 'people' were trying to torture and kill him," and the decedent's wife had indicated that the "Decedent was a paranoid schizophrenic, had been repeatedly hospitalized, . . . required immediate medication . . . to correct a chemical imbalance," and "had suicidal tendencies." 143 Cal. App. 3d at 304. The Court of Appeal reversed the dismissal of the complaint alleging that the sheriffs breached their statutory duty to summon medical care, and held that the sheriffs' "actual or constructive knowledge of Decedent's need for immediate care" and "reasonable action to summon . . . such care" were "questions of fact to be determined at trial." *Id.* at 317.

This case falls between *Lucas* and *Johnson* as to the need for mental health care. Officer Brice, unlike the sheriffs in *Johnson*, was not specifically told by either Horton or his mother that Horton "required immediate medication" or was presently "attempting to commit suicide." But there was considerably more than "a scintilla of evidence" that Horton required immediate medical attention: Officer Brice knew from his conversation with Horton's girlfriend that Horton had chased his girlfriend with a knife, stabbed a friend in the leg and sympathized with the suspects in mass homicides, and, on the facts most favorable to Horton, had been told that Horton was suicidal, had put cigarettes out on his face, had recently been hospitalized after threatening to kill himself, and would benefit from "access to mental health." Moreover,

"[i]t is significant that in . . . *Lucas* . . . the court's rejection of claims pursuant to section 845.6 was based in large part upon failure of proof at trial." *Zeilman*, 168 Cal. App. 3d at 1186. A "trier of fact" should be permitted to determine whether the information Officer Brice had "should have given rise to knowledge of [the] need for immediate medical care." *Id.* at 1186–87.

As to immediacy, the defendants argue that Officer Brice could not reasonably be expected to have known the urgency of the situation. "Liability under section 845.6 is limited to serious and obvious medical conditions requiring immediate care." *Watson v. State*, 21 Cal. App. 4th 836, 841 (Ct. App. 1993); *see id.* at 843. But that immediacy standard is, under the applicable case law, relaxed.[14] In *Jett v. Penner*, we held that the need for "immediate medical care" under § 845.6 arises when a prisoner is instructed that he must see a doctor "this week" to have a fractured thumb set and placed in a cast. 439 F.3d at 1099. *Jett* thus makes clear that "immediate" does not signify urgent; rather, the obligation to summon immediate medical care requires that the public employee act in a "timely" manner, so as to prevent further injury. *Id.* at 1093.

In sum, on the facts construed in the light most favorable to Horton, a reasonable jury could conclude that Officer Brice had "reason to know" Horton had a "serious" medical condition and required "immediate medical care" as that term

---

[14] *Castro v. County of Los Angeles* involved the risk of serious harm associated with placing a combative inmate in the same cell as another detainee. 833 F.3d at 1064. *Castro* did not address the question of how "immediate" the risk of serious harm — or specifically of suicide — must be to sustain a deliberate indifference claim under that objective standard.

is interpreted under California law, and that he failed timely to summon such care. The partial dissent disagrees with us that the evidence revealed Horton's risk of suicide was immediate enough to require prompt medical attention. Partial Dissent 42–44. But this disagreement is precisely the type of question that should be left to a jury and not decided on summary judgement. "[Q]uestions about jail personnel's actual or constructive knowledge of a prisoner's need for immediate medical care as well as the reasonableness of actions taken to meet this need are factual questions . . ." *Zeilman*, 168 Cal. App. 3d at 1184. In reviewing the denial of summary judgment, "[t]his court does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999); *see also Zeilman*, 168 Cal. App. 3d at 1187 ("[D]ifficulty in proof does not equate to resolution as a matter of law."). Whether Officer Brice had reason to know that Horton faced a need for immediate mental health care and failed to summon it is a "question[] of fact to be determined at trial" on which "we need not . . . speculate." *Johnson*, 143 Cal. App. 3d at 316. Having so determined, we affirm the district court's denial of summary judgment in favor of Officer Brice and the municipal defendants on the § 845.6 claim.

## Conclusion

We conclude that Officer Brice is entitled to qualified immunity as a matter of law and so reverse the district court's denial of summary judgment in favor of Officer Brice on the § 1983 claim. We next hold that we lack jurisdiction to review the district court's denial of summary judgment in favor of the municipal defendants on the § 1983 claim. In doing so, we caution that, "it is not enough for a § 1983

plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404. In holding that municipal defendants may be liable in a § 1983 action even absent a finding of liability on the part of any individual officer — and that we therefore lack jurisdiction to review the district court's denial of summary judgment in favor of the municipal defendants on Horton's § 1983 claims — we express no views on whether the municipal defendants here may properly be held liable. Instead, we remand to permit the district court to consider the remaining claims in light of this court's recent guidance in *Castro* and *Gordon*.

Finally, we affirm the district court's denial of summary judgment on the state law claim.

**REVERSED in part, AFFIRMED in part, and REMANDED.**

---

BYBEE, Circuit Judge, dissenting in part:

This is a tragic case. Officer Brice's phone call with Horton's mother likely left him with the impression that Horton was a troubled young man experiencing a difficult period in his life. The call could not have resulted in Officer Brice preventing the suicide attempt, as it is undisputed that Horton had already hanged himself and stopped moving by the time the call ended. Maj. Op. 9 n.5. But had Officer Brice checked on Horton immediately afterwards, his brain damage could have been mitigated.

None of this means, however, that Officer Brice can be held liable under the Fourteenth Amendment or California law.  I join the majority opinion in concluding that Officer Brice is entitled to qualified immunity for Horton's deliberate-indifference claim under 42 U.S.C. § 1983.[1]  *See* Maj. Op. § II.A.  The evidence fails to establish that "a reasonable officer would . . . have known that failing to attend to Horton immediately would be unlawful."  *See id*. at 15.  The same reasoning dictates that we hold that Officer Brice is entitled to state-law immunity under California Government Code § 845.6.  I would therefore also reverse the district court as to this claim, and I respectfully dissent only from this portion of the opinion.  *See* Maj. Op. § II.C.

A deliberate-indifference claim under § 1983 is not identical to a claim brought under § 845.6.  The California statute is unusual, as it "confers a broad general immunity" on public entities and their employees, *Watson v. State*, 26 Cal. Rptr. 2d 262, 265 (Cal. Ct. App. 1993), yet simultaneously imposes an affirmative duty on them that can give rise to liability under narrow circumstances, *Johnson v. County of Los Angeles*, 191 Cal. Rptr. 704, 717 (Cal. Ct. App. 1983); *Nelson v. State*, 188 Cal. Rptr. 479, 483 (Cal. Ct. App. 1982).  Specifically, the statute's first clause confers immunity from suit "for injury proximately caused by the failure of the employee to *furnish* or *obtain* medical care for a prisoner in his custody . . . ."  Cal. Gov't Code § 845.6 (emphasis added); *see also Castaneda v. Dep't of Corr. & Rehab.*, 151 Cal. Rptr. 3d 648, 663 (Cal. Ct. App. 2013).  The second clause is the exception to this rule, exposing a public

---

[1] I also join the opinion's subsequent section concluding that we lack jurisdiction to review the denial of summary judgment as to Horton's *Monell* claim.  *See* Maj. Op. § II.B.

employee to suit only when he "knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to *summon* such medical care." Cal. Gov't Code § 845.6 (emphasis added). "Thus, section 845.6 creates out of the general immunity a *limited* cause of action against a public entity for its employees' failure to *summon* immediate medical care only. The statute does not create liability of the public entity for malpractice in furnishing or obtaining that medical care." *Castaneda*, 151 Cal. Rptr. 3d at 663 (first emphasis added) (citations omitted).

To state a claim under § 845.6, a plaintiff must satisfy three elements. *See id*. First, he must establish that whatever action he contends that the defendant should have taken—the statute is after all explicitly premised only on a failure to act—constitutes summoning medical care. *See* Cal. Gov't Code § 845.6. Next, there is the knowledge component: the plaintiff must prove that the defendant knew or should have known that the plaintiff was in need of this medical care and that the need was immediate. *Id.* Finally, the plaintiff must establish that the defendant failed to act reasonably to meet the medical need. *Id*.

Horton cannot satisfy either of the first two elements. He has thus failed, as a matter of law, to establish that Officer Brice may be subjected to suit under state law. I address each element in turn.

I

Section 845.6 creates liability only for the failure to summon medical care rather than for all omissions by a public employee that cause injury to a person in his custody.

Consider, for instance, a Sheriff's deputy who is tasked with assembling a new bunk bed in a cell at a county jail and does so negligently by failing to read the instructions and not using all provided parts. If the bed later collapses and consequently breaks its occupant's leg, § 845.6 would not expose the deputy to liability for that injury. The deputy might be liable under some other law, but not for violating § 845.6. Conversely, if a different deputy on duty witnessed the accident and took no action despite the prisoner's complaints of pain to his leg, this second deputy would likely be liable; he would not be immune from suit for any additional injury caused by the delay in summoning medical care to treat the leg. *See, e.g.*, *Jett v. Penner*, 439 F.3d 1091, 1099 (9th Cir. 2006).

A claim premised on suicidal ideation creates a particularly difficult question as to what types of omissions would constitute a failure to summon medical care. Even if an officer had knowledge that there was an imminent risk that the prisoner would make an attempt on his own life, it would be difficult to say that a failure to remove that prisoner's bedsheets and shoelaces would fall within this statute's ambit because it is not natural to describe the removal of such items as summoning medical care. The failure to remove them might violate some other provision of California law, but the omission is not an obvious violation of § 845.6.

Here, our analysis is complicated by the fact that Horton's complaint consists of a single conclusory allegation regarding what omissions purportedly violated § 845.6: "Defendants . . . knew, or had reason to know, that Shane Horton was in need of immediate medical care, supervision and safeguarding and that he was suicidal and at risk of injuring himself, but failed to take reasonable action to summon such

medical care . . . ." Horton adds little clarity on appeal, merely highlighting the fact that he was "already slumped on the floor motionless when Officer Brice finished" the call as evidence that he "was in immediate need of medical attention." But the fact that Horton needed to be resuscitated once he had already hanged himself says nothing about what actions Officer Brice should have taken *before* he returned to Horton's cell and discovered the suicide attempt.[2]  In other words, Horton's argument is circular; he implies that, because he was in need of medical care once he had hanged himself, *any* omission by Officer Brice constituted a failure to summon medical care.

Ultimately, it is evident that Horton's state-law claim, like his § 1983 claim, is premised on his contention that "the information communicated by . . . Horton's mother *should have prompted [Officer Brice] to check on Horton promptly* and discover the need for immediate medical care." As addressed below, I do not believe Horton has provided any evidence that Officer Brice knew or should have known that Horton was in *immediate* danger of harming himself. But even assuming that this knowledge component is satisfied, the majority opinion does not address how Officer Brice's failure to check on Horton immediately after the phone call constitutes a failure to *summon medical care*. The majority has not explained why this statute even applies in this case.[3]

---

[2] Horton has never alleged—nor does the record show—that Officer Brice delayed in summoning emergency care *after* he discovered that Horton had hanged himself. Rather, Officer Brice personally administered CPR until paramedics arrived.

[3] Section 845.6 grants immunity to an officer who fails to "*furnish* or *obtain* medical care" but limits an officer's liability to a failure "to *summon* such medical care" when the officer has actual or constructive

The California Court of Appeal emphasized this precise deficiency in *Lucas v. City of Long Beach*, where the decedent hanged himself in his cell after being arrested on a charge of being drunk and disorderly:

> Plaintiff, [the decedent's mother] . . . , offered *no evidence as to what kind of medical care she claims should have been provided* and more importantly she offered no evidence as to how such medical care could have prevented the death. [The decedent] was not in fact in need of immediate medical care and clearly lack of medical care did not "cause" the death.
>
> *True the continuous presence in the cell of a doctor, a nurse, or, for that matter, a policeman probably would have prevented the suicide*. The jury apparently reasoned along these lines. Government Code section 845.6,

---

knowledge of its immediate need.  Cal. Gov't Code § 845.6 (emphasis added).  Therefore, this statute does not create an affirmative duty for an officer to personally *furnish* medical care.  *Castaneda*, 151 Cal. Rptr. 3d at 666 ("Were we to conclude the duty under section 845.6 includes furnishing, monitoring, followup, or subsequent care for the same condition, . . . we would be expanding the liability of the public entity beyond that contemplated by the Legislature.").  Accordingly, if an inmate accidently severs his hand in the prison's machine shop, a supervising guard will undoubtedly be liable under § 845.6 for not radioing in for immediate medical aid.  The guard would, however, be immune from suit if the inmate alleged only that the guard should have personally administered a makeshift tourniquet.  This distinction demonstrates why California courts have concluded that the statute "is very narrowly written," *id*. at 663, and further highlights that Horton's claim is not premised on a failure to summon care.

however, in affixing liability for failure to summon "immediate medical care" for a person in need thereof envisions liability for injury resulting from the failure to treat the physical condition requiring treatment and *not for some other incidental injury that might have been prevented by the mere presence of medical personnel*. The jury's findings that it was negligence not to provide medical treatment and that that failure was the "cause" of death are not supported by any evidence to be found in the record.

131 Cal. Rptr. 470, 475 (Cal. Ct. App. 1976) (emphasis added). *Lucas* thus demonstrates that, as discussed above, not all forms of omission give rise to liability under § 845.6. Although Officer Brice's presence in Horton's cell immediately after the call may have prevented Horton from suffering the degree of brain damage that he did, any failure to check on Horton sooner falls outside the statute's narrow exception to immunity.

Rather than confronting this dispositive flaw in Horton's state-law claim,[4] the majority summarily asserts that the claim is "not . . . limited" to "Officer Brice's *own* failure to return immediately to Horton's cell . . . ." Maj. Op. 27. Tellingly, the majority supports this conclusion by citing only to Horton's complaint, which, as seen above, does not allege

---

[4] The majority fails to address the above-quoted reasoning in *Lucas* regarding the medical-care element under § 845.6. Instead, the majority addresses *Lucas* only in the context of the statute's knowledge element—i.e., whether Officer Brice should have known that Horton posed an *immediate* suicide risk. Maj. Op. 27–29.

a single specific action that Officer Brice failed to take. *See id*. This is unsurprising. Nothing in Horton's briefing or the record indicates that his claim, as to Officer Brice, is premised on anything other than the officer not immediately checking on him.

Undeterred, the majority supplements Horton's claim for him, concluding that Officer Brice could have ordered a psychiatric evaluation for Horton—as Officer *Schneider* suggested earlier that day.[5] *Id*. I have two objections. First, Horton has never contended that such an evaluation is the type of medical care that Officer Brice should have summoned after the call with his mother. It is improper for the majority to deny Officer Brice state-law immunity based on an argument that it manufactured. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994).

But second, even if properly before us, this new argument does not cure this claim. The majority's assertion that Officer Brice should have ordered a psychiatric evaluation is a circuitous attempt to argue that the officer or third-party medical personnel failed to furnish medical care and, in the process, could have more quickly discovered the suicide attempt. California cases have repeatedly rejected such claims. *See, e.g.*, *Lucas*, 131 Cal. Rptr. at 475 ("[S]ection 845.6 . . . , in affixing liability for failure to summon 'immediate medical care' for a person in need thereof envisions liability for injury resulting from the failure to treat

---

[5] Officer Schneider referenced "[p]robably do[ing] a psych or something" to Horton after the two had a half-an-hour conversation. Officer Brice was not at the police station at the time, and the record does not show that Schneider later conveyed this suggestion or the conversation's content to Brice.

the physical condition requiring treatment and not for some other incidental injury that might have been prevented by the mere presence of medical personnel."); *see also Castaneda*, 151 Cal. Rptr. 3d at 663–64 (discussing "[t]he distinction between failure to summon medical care—for which the State can be held liable under section 845.6—on the one hand, and negligence in providing care—for which the State is immune—on the other hand"); *id*. at 664 n.10, 666 (repeating the point); *Nelson*, 188 Cal. Rptr. at 485 ("Failure of a practitioner to prescribe or provide necessary medication or treatment . . . is . . . medical malpractice . . . [but] cannot be characterized as a failure to summon medical care.").

Moreover, the medical care that the majority insists upon would not have addressed Horton's medical needs—he had already hanged himself by the time that the call ended. There is also no evidence that ordering a psychiatric evaluation would have resulted in Officer Brice more quickly checking on Horton. Officer Brice could have ordered an evaluation—a paperwork or telephone request—without checking on Horton. It is likely that doing so would have required the officer to spend additional time on administrative tasks outside of Horton's presence, only further delaying his return to the cell. Accordingly, Horton has failed to show that any purported omission by Officer Brice falls within the scope of § 845.6 liability.

By disregarding the statute's medical-care element, the majority opinion undermines California's intent to immunize its employees and to allow suit only when an employee has actual or constructive knowledge of an immediate medical need. The opinion has converted § 845.6 into a general negligence provision, ignoring "[t]he limited nature of the

duty to summon under section 845.6." *Castaneda*, 151 Cal. Rptr. 3d at 666.

II

Even if Horton could establish that any omission constituted a failure to summon medical care, he has separately failed to provide evidence that Officer Brice knew or should have known that there was an *immediate* danger that he would harm himself. In concluding that Horton has raised a triable issue, the opinion cites to *Zeilman v. County of Kern* for the proposition that "jail personnel's actual or constructive knowledge of a prisoner's need for immediate medical care as well as the reasonableness of actions taken to meet this need are factual questions . . . ." 214 Cal. Rptr. 746, 753 (Cal. Ct. App. 1985); Maj. Op. 30. But even *Zeilman* recognized that summary judgment on § 845.6 claims can be appropriate in some circumstances, 214 Cal. Rptr. at 754, and its facts are distinguishable from this case.

In *Zeilman*, the plaintiff was being booked at the county jail following her arrest and was relying on crutches due to a ski accident. *Id*. at 747–48. After the booking process was complete, a deputy directed the plaintiff to sit down at a nearby chair, but she fell when her crutches slipped out from under her. *Id.* at 748–49, 754. In opposing summary judgment on her § 845.6 claim, she presented a declaration from her attorney "stating that he arrived at the jail during the booking procedure and could observe his client being booked, in an 'aggitated [sic], emotional and weakened condition which was *easily apparent to him and any other person in his vicinity.*'" *Id*. at 748 (emphasis added). The Court of Appeal reversed the trial court's grant of summary judgment, reasoning that a jury had to determine whether this evidence

and the plaintiff's use of crutches "should have given rise to knowledge of her need for immediate medical care."  *Id*. at 754.

In reaching this conclusion, *Zeilman* distinguished these facts from *Lucas*, the detainee-suicide case discussed above. *Id*. at 753–55.  In *Lucas*, the plaintiff not only failed to establish that the officer's purported omission constituted medical care, but she also failed to provide evidence that the officer should have known that there was an immediate suicide risk.  *Lucas*, 131 Cal. Rptr. at 475.  Indeed the decedent was merely drunk and visibly upset about "the effect that his arrest would have on his mother . . . ."  *Id*. ("[T]here is not a scintilla of evidence in the record indicating that his conduct was any different than one might expect of a person intoxicated on either drugs or alcohol.").

The *Zeilman* court also addressed *Kinney v. County of Contra Costa*, where the detainee merely asked the officer if she could be given something for "a very bad headache" and was denied.  87 Cal. Rptr. 638, 644 (Cal. Ct. App. 1970). Although the plaintiff claimed she was "ready to collapse" by the time she was released from the police station, the Court of Appeal held that a request for aspirin "cannot reasonably be deemed notice 'that the prisoner is in need of immediate medical care.'"  *Id*.

In distinguishing *Lucas* and *Kinney*, *Zeilman* emphasized that both earlier cases had proceeded to a jury but that the plaintiffs had failed to produce sufficient evidence at trial.[6]

---

[6] In *Lucas*, a jury rendered a verdict in the plaintiff's favor, but the Court of Appeal reversed on a sufficiency-of-the-evidence claim. 131 Cal. Rptr. at 474.  The trial court in *Kinney* issued a judgment of nonsuit at the

214 Cal. Rptr. at 754. The majority in our case highlights this point without acknowledging that the *Zeilman* court nonetheless concluded that summary judgment might have been proper in both *Lucas* and *Kinney*. *Id*. Accordingly, *Zeilman* does not stand for the proposition that a § 845.6 claim per se precludes summary judgment. Such relief would have certainly been warranted in *Lucas*, where the plaintiff failed to provide evidence supporting the medical-care and knowledge elements. In contrast, the plaintiff in *Zeilman* came forward with at least some evidence that the deputy should have known she was in need of immediate assistance[7] in the form of her lawyer's attestation that her weakened condition was visibly and readily apparent.

This brings me to the evidence in this case. Horton's mother testified during her deposition that she told Officer Brice "'everything' about the December 13, 2012 incident—Horton's use of drugs, the cigarette marks on his face and hands, the knife he held to his throat, his hospitalization with an initial '5150' hold for risk of suicide, the CARES official's conclusion that he could be discharged because his conduct was due to drugs not suicidal ideation, and [Mrs. Horton's] disagreement with that conclusion." Maj. Op. 8. She "testified that she also told Officer Brice that her son was depressed and suicidal, that she was really

---

close of the plaintiff's case in chief, which the Court of Appeal affirmed. 87 Cal. Rptr. at 644.

[7] I question whether failing to help the plaintiff in *Zeilman* to her chair constitutes a failure to summon medical care. Although the *Zeilman* court quoted the relevant medical-care language from *Lucas*, it did not address that element in distinguishing the two cases, which appears not to have been in dispute.

worried about him, and that she believed he could be helped in the judicial system." *Id*.

This testimony admittedly distinguishes our case from *Lucas*, where there was no evidence whatsoever that the detainee suffered from suicidal ideation. But even when the evidence here is taken in the light most favorable to Horton, I would hold that no reasonable jury could find that Officer Brice should have known that there was an *immediate* risk that Horton would harm himself and that the officer therefore needed to take immediate action. A person can suffer from depression and suicidal thoughts for years without ever harming himself. Indeed, the incident that Horton's mother described to Officer Brice occurred two weeks prior to the arrest, and she provided no evidence that Horton had made any attempts or threats on his life in the intervening period. Seeking "help[] in the judicial system" is not close to a call for immediate assistance for someone who recently exhibited suicidal ideation.

This is not a case where Horton's parents had imposed an informal 24/7 suicide watch on him. His father had kicked him out of the house after the glass-breaking incident, so it appears Horton was living independently, without supervision for the two weeks preceding his arrest. Moreover, his mother did not rush down to the police station once she heard that her son had been arrested; rather, she had just told Horton that she would not bail him out. Horton's mother was certainly concerned about his well-being, but she never claims to have expressed to Officer Brice that Horton would likely make an attempt on his life if the officer did not take immediate action to ensure Horton was unable to do so—e.g., by removing his belt, moving him to a secured, padded cell, and monitoring him constantly. It would certainly have been prudent of

Officer Brice to pass along the information Horton's mother claims to have given him to the officials at the county jail once Horton was transferred, but that falls far short of failing to recognize Horton's immediate need for medical care.

Moreover, Horton's mother testified that she spoke to Officer Brice for ten to fifteen minutes—a substantial amount of time. Had she thought her son was in *immediate* danger of harming himself, she would have told Officer Brice to drop the phone and rush to Horton's cell. Indeed, if anything, the officer's patient call with Horton's mother would have reinforced that Horton needed a psychiatric evaluation—which was likely obtainable at the county jail rather than at the police station where Horton was being temporarily held.

The majority does not address this absence of evidence. Nor does it attempt to reconcile its conclusion that Officer Brice, for the purpose of the state-law claim, should have known that Horton posed an immediate suicide risk with our holding regarding his § 1983 claim: "Based on these facts, . . . a reasonable officer would not have known that failing to attend to Horton immediately would be unlawful." Maj. Op. 15.

The majority instead summarily cites *Jett* for the proposition that the "immediacy standard" under § 845.6 is more "relaxed" than under § 1983 deliberate-indifference claims.[8] Maj. Op. 29. But this conclusion misconstrues *Jett*.

---

[8] Horton does not cite *Jett*. Nor does he contend that a claim premised on suicidal ideation entails a lesser showing of immediacy of harm under § 845.6 than under the deliberate-indifference standard.

There, the emergency-room doctor instructed the prisoner-plaintiff to follow-up with an orthopedic doctor "early this week" after he fractured his thumb. *Jett*, 439 F.3d at 1094. The plaintiff saw a prison doctor three days later, but his hand was too swollen to be placed in a permanent cast. *Id*. Despite reports of pain and numerous requests to visit an orthopedist, it took an additional two months for the plaintiff to be seen even by another prison doctor. *Id*. After four additional months, the plaintiff finally visited an orthopedic specialist, "who determined [the plaintiff] should be referred to a hand specialist because the fracture had healed improperly." *Id*. at 1095. The evidence demonstrated that the delay in seeing an orthopedist prevented the fracture from correctly aligning. *Id*. at 1098.

We reversed the district court's grant of summary judgment on the plaintiff's deliberate-indifference claims, concluding that there was evidence that several prison officials knew of but ignored the plaintiff's need to set his fracture. *Id*. In regard to his § 845.6 claim, we held that there was "a triable issue of fact . . . as to whether [the plaintiff] received immediate medical care for his diagnosed fractured thumb because the fracture was not set and placed in a cast." *Id*. at 1099. We reasoned that "the need for 'immediate medical care' can arise more than once in relation to an *ongoing* serious medical condition" and that this need "arose as soon as [the plaintiff's] swelling subsided and his fracture could be reduced and a cast applied." *Id*. (emphasis added).

Accordingly, *Jett* provides no insight into how immediate a medical need must be under § 845.6. The plaintiff's

---

Again, it is improper for the majority to raise arguments that Horton has failed to advance.

medical condition was ongoing and his need for care resurfaced as soon as his reduced swelling made the original prescribed treatment possible.**[9]**  Thus, the key point in *Jett* regarding both § 845.6 and deliberate indifference is that there was evidence that prison officials had actual knowledge that the plaintiff had a *time-sensitive* medical need and took no action for many months.  The case does not support the majority's conclusion.

In my view, Horton's claim fails because he has not provided evidence that Officer Brice should have known that Horton posed such a degree of suicide risk that the officer should have immediately rushed to his cell instead of spending twelve to seventeen minutes arranging to transfer Horton and another detainee to county jail.

### III

I sympathize deeply with Horton and his mother, but there is no basis under California law for subjecting Officer Brice

---

**[9]** The California Court of Appeal has criticized our conclusion in *Jett*, reasoning that the duty to summon medical care does not extend to ensuring that proper follow-up treatment—i.e., setting the fracture—is eventually provided.  *Castaneda*, 151 Cal. Rptr. 3d at 666 ("[T]he Ninth Circuit's application of section 845.6 ignores California authority interpreting that statute.  California courts hold the failure to prescribe necessary medication or, once summoned to provide treatment, to ensure proper diagnosis, or to monitor the progress of an inmate that the public employee has been summoned to assist, are issues relating to the manner in which medical care is *provided*, and do not subject the State to liability under section 845.6 for failure to *summon*.").  The majority opinion creates additional tension between *Jett* and *Castaneda* because *Jett* is inapposite and should not have been cited.  *See Scalia v. County of Kern*, 308 F. Supp. 3d 1064, 1087 (E.D. Cal. 2018) (declining to follow *Jett*'s interpretation of § 845.6 in light of *Castenada*).

to suit.  Considered in the light most favorable to Horton, the events earlier that day and the phone call with his mother did not imbue Officer Brice with the actual or constructive knowledge that Horton would attempt suicide at any moment. And although it may have been prudent for Officer Brice to immediately check on Horton, his decision not to do so is not a failure to summon medical care.  For these two independent reasons, I would reverse the district court's denial of summary judgment to Officer Brice on Horton's § 845.6 claim.

I respectfully dissent as to this claim.